[Crim. No. 4969.  In Bank.  June 15, 1949.]

THE PEOPLE, Respondent, v. THOMAS E. TUBBY, Appellant.

Frank K. Richardson, James William Morgan and James O. Kibby for Appellant.

Fred N. Howser, Attorney General, Doris H. Maier, Deputy Attorney General, and Clyde H. Larimer, District Attorney, for Respondent.

SHENK, J.—The defendant was charged by the grand jury of Glenn County with the murder of his stepfather Robert A. Fleenor. He pleaded not guilty and not guilty by reason of insanity. On the first plea the jury returned a verdict of guilty without recommendation. On the trial of the insanity plea the jury found that the defendant was sane at the time the offense was committed. A motion for a new trial and a motion to modify the judgment by reducing the degree of the crime to second degree murder were denied. The appeals are from the judgment imposing the death penalty and from the orders denying the motions.

On the appeal the defendant admits that he unlawfully killed the deceased. His contentions are that the evidence does not support a conviction of murder in the first degree; that the district attorney was guilty of prejudicial misconduct in his argument to the jury and in the cross-examination of a witness, and that the court committed prejudicial error in refusing to give a requested instruction on motive.

The facts are undisputed. The defendant is a 29-year-old uneducated agricultural worker of part Cherokee-Choctaw extraction. He is 6 feet tall and weighs 175 pounds. In the past few years he resided intermittently with his mother, Mrs. Louelle Fleenor, and his stepfather, the deceased, in the Fleenor home 1 mile east of the city of Orland, Glenn County. At the time of his death, Fleenor was a feeble man 82 years of age and weighing less than 100 pounds. During the early fall of 1948, the defendant was employed near Orland as a ranch hand and almond knocker. On the morning of September 13, 1948, he was taken to work by his mother. He and three coworkers, a couple named Martin and a man named Smith, began working at about 8 o'clock, then stopped a half-hour later to drink a quart of sherry which the Martins had brought. About 10 o'clock Smith drove to Orland where he purchased a gallon of sherry of which a half-gallon was consumed. The defendant drank about two quarts in all. At about 2:30, the Martins and Smith, believing that the defendant was

getting drunk and fearing that he might fall from a tree on which he was working, decided to take him home in Smith's car. Each testified that the defendant was drunk but that he walked straight and talked without thickness of tongue. On arriving at the Fleenor home at about 3:30 the defendant found his mother was not there. He went into the yard where he saw the deceased. Two men working on a house across the street observed the defendant strike the deceased with his fist. They shouted at him but he claimed not to have heard them. He was then seen dragging the deceased into the house. One of the workers asked a neighbor to call the police and then, standing in front of the Fleenor home, heard thumping noises from within which continued for a period of several minutes.

In a signed statement given on September 15th, the defendant stated that he walked toward the deceased in the yard and when he came close "just hauled off and let fly with my fist"; that there had been no argument; that not a word was spoken prior to the attack; that he wasn't "mad at" the deceased at the time, and that the only argument he had had with Mr. Fleenor occurred two or three months before over the trimming of a hedge; that after striking the deceased once, he "began thinking of what I had done and I thought I better take him into the house"; that he then dragged the deceased into the house; that he remembered "something about him [the deceased] scuffling around the stove"; that he "may have hit him two or three times" but that he did not hit him with anything but his fist; that Mr. Fleenor ran in circles in a futile attempt to escape but did not speak; that the deceased "came over by the side of me and looked at me and when he did I hit him again and then I see he was laying on the floor and blood was coming out of his nose . . ."; that with the final blow, he "felt something snap and I knew I had done something, and I come to myself, but before that I was in a drunken stupor and didn't seem to know what I was doing"; that he then pushed the deceased with his foot in an attempt to make him get up; that he guessed he wanted to revive the deceased so dragged him through the house wondering what to do; that he did not remember seating the deceased in a rocking chair where he was found when the officers arrived. The defendant stated he was so drunk he did not know what he was doing.

At the trial on the first plea the defendant contradicted his voluntary statement of September 15th in some particulars,

but on the trial of the insanity plea he retracted his denials and gave a version of the killing which accorded substantially with his prior statement.

When the police arrived about 15 minutes after the first assault the defendant was seen walking rapidly from the house. He stopped when ordered to do so and came back to meet the officers. He then offered to fight one of them and called him a profane name, but was subdued when the officer struck him. An examination of the defendant's right hand disclosed it to be swollen and moderately contused. The arresting officer testified that the defendant showed no sign of intoxication.

The deceased was found to be in a semicomatose condition when a physician arrived. He was removed to a hospital and died the same day. Cause of death was stated to be basal skull fractures and intercranial hemorrhage.

Generally the determination of the degree of the crime is left to the discretion of the jury. (*People* v. *Eggers*, 30 Cal.2d 676, 685 [185 P.2d 1]; *People* v. *Wells*, 10 Cal.2d 610 [76 P.2d 493]; *People* v. *Mahatch*, 148 Cal. 200, 203 [82 P. 779].) But the jury's discretion is not absolute. Since the amendment of section 1181 of the Penal Code in 1927 trial courts and reviewing courts are authorized to modify the judgment and fix a lesser degree of the crime in those instances where on an appraisal of all the evidence there is found to be lacking any substantial evidence of the elements required to constitute the degree of the crime as fixed by the jury. (*People* v. *Kelley*, 208 Cal. 387 [281 P. 609]; *People* v. *Holt*, 25 Cal.2d 59, 90 [153 P.2d 21]; *People* v. *Bender*, 27 Cal.2d 164, 186 [163 P.2d 8].)

In support of the verdict the attorney general asserts that the infliction of multiple injuries as a result of continued beating of an aged victim, frail and unarmed, indicates an intention on the part of the defendant to inflict pain and suffering which may reasonably be said to constitute torture within the meaning of section 189 of the Penal Code, and therefore to result in murder of the first degree by statutory declaration. It is argued that the defendant's primary intention must have been to inflict pain for purposes of punishment or deep-seated revenge.

Torture has been defined as the "Act or process of inflicting severe pain, esp. as a punishment in order to extort confession, or in revenge." (Webster's New Int. Dict. (2d ed.).) The dictionary definition was appropriately enlarged upon

by this court in its original opinion in *People* v. *Heslen*, 163 P.2d 21, 27 in the following words: "Implicit in that definition is the requirement of an intent to cause pain and suffering in addition to death. That is, the killer is not satisfied with killing alone. He wishes to punish, execute vengeance on, or extort something from his victim, and in the course, or as the result of inflicting pain and suffering, the victim dies. That intent may be manifested by the nature of the acts and circumstances surrounding the homicide." (See disposition of that case on rehearing, 27 Cal.2d 520 [165 P.2d 250].) The Colorado Supreme Court has declared in similar terms that as an essential of torture physical pain must be inflicted as a means of persuasion, punishment or in revenge. (*Townsend* v. *People*, 107 Colo. 258, 265 [111 P.2d 236].) In holding that a murder by strangulation was not necessarily murder by torture this court has stated: "The killer who, heedless of the suffering of his victim, in hot anger and with the specific intent of killing, inflicts the severe pain which may be presumed to attend strangulation, has not in contemplation of law the same intent as one who strangles with the intention that the victim shall suffer." (*People* v. *Bender*, 27 Cal.2d 164, 177 [163 P.2d 8].)

In determining whether the murder was perpetrated by means of torture the solution must rest upon whether the assailant's intent was to cause cruel suffering on the part of the object of the attack, either for the purpose of revenge, extortion, persuasion, or to satisfy some other untoward propensity. The test cannot be whether the victim merely suffered severe pain since presumably in most murders severe pain precedes death.

In this case the record is devoid of any explanation of why the defendant might have desired his stepfather to suffer. The only testimony concerning the relationship between the two men was that the deceased and the defendant were on amicable terms prior to the attack. Mrs. Fleenor, the defendant's mother, stated that the defendant "is all right when he isn't drinking . . ." She testified further that the defendant "never used intoxicating liquor until 1938 when he got drunk that time and got into that trouble." (Probably referring to a previous conviction of manslaughter.) When asked how the defendant acts when drunk, she replied: "Acts like any other crazy drunk." An indication that the defendant was in a "fighting mood," inclined to fight almost anyone and not primarily interested in causing the ultimate victim to

suffer, is the fact that he offered to fight the arresting officer and had to be subdued by force. It is too apparent to admit of serious doubt that the unprovoked assault was an act of animal fury produced when inhibitions were removed by alcohol. The record dispels any hypothesis that the primary purpose of the attack was to cause the deceased to suffer. When death results under the circumstances here shown the homicide cannot be said to constitute murder by torture in the popular, dictionary, or legal sense. The evidence is therefore insufficient as a matter of law to support the verdict on the theory that the homicide was murder by torture.

The second basis on which the attorney general rests his contention that this was first degree murder is that the killing was willful, deliberate and premeditated. Again the evidence is inadequate to support the contention. The facts on which the attorney general relies as supporting his claim that Mr. Fleenor was killed by means of torture are also referred to as disclosing deliberation. It is argued that deliberation and premeditation are manifest in the circumstance that the defendant dragged Mr. Fleenor into the house after striking him, away from the view of and interference by neighbors, and in the brutality and duration of the beating.

In determining whether the killing was accompanied by a deliberate and premeditated intention to take life such circumstances as the previous relations between defendant and the victim, the actions of the defendant before as well as at the time of the killing, and the means by which the homicide is accomplished, are important. The only evidence in the record as to the relationship between the defendant and his stepfather is the testimony of Mrs. Fleenor and the statement of the defendant himself. When asked whether Mr. Fleenor and the defendant ''got along'' Mrs. Fleenor answered: ''Mr. Fleenor never said anything about him [the defendant] or to him except in a friendly way.'' The defendant stated he wasn't ''mad at'' the deceased. At no time while in the company of the Martins and Smith in the hours preceding the crime did the defendant suggest that he contemplated attacking the deceased or even mention him. Even if we disbelieve entirely, as the jury might, the defendant's assertion that he was so drunk that he did not know what he was doing, it is clear that his drinking affords the sole explanation for his atrocious conduct. It is perhaps a reasonable inference that the defendant dragged the deceased inside the house to continue his assault unmolested by neigh-

bors, but that in itself would not warrant the further inference that with a preexisting intent he set about to kill his stepfather. The cumulative effect of all the circumstances seems to negative any possibility that the defendant on reflection formed a design to produce death before or at any stage of the incident.

■ Contentions of the defendant that he is entitled to a new trial because of alleged misconduct of the district attorney at the trial are without substance. In the course of his closing argument to the jury the district attorney stated of the defendant: ''He went blood crazy once he made up his mind to commit the act, he completed it and then he used his fist.'' Counsel for the defendant states that the prosecution was thus enabled to argue before the same jury which tried the issues of guilt and insanity, that ''the defendant was sane for some purposes but insane for others,'' to the defendant's prejudice. The phrase ''blood crazy'' is a colloquialism which perhaps described the defendant's condition. It would be absurd to say that its use so prejudiced the defendant's case as to require a new trial.

■ For impeachment purposes the district attorney asked the defendant on cross-examination whether he had been previously convicted of a felony, the nature of the felony, and then, over the objection of the defendant's counsel, where he was convicted. It is impossible to believe that the defendant was prejudiced in any way by the single additional question as to where the defendant was convicted. Had the prosecution chosen, it could have proved the felony conviction by the record of the judgment (Code Civ. Proc., § 2051) which would have disclosed the place of conviction.

■ As to the charge that the trial court erred in refusing to give the defendant's offered instruction on motive it appears from the record that the subject of motive was fully covered by an instruction which was given.

■ The evidence is insufficient to support the verdict of conviction of murder in the first degree, but it is unquestionably sufficient to support a conviction of second degree murder, and the trial court should have granted the motion to modify the judgment. However it is unnecessary to reverse the order denying that motion for the reason that this court has the power on this appeal, under section 1181 of the Penal Code, to accomplish the proper result by modifying the judgment and affirming it as modified.

Accordingly: The order denying the motion for a new

trial is affirmed. The judgment is modified by reducing the degree of the crime to murder of the second degree and as so modified the judgment is affirmed. The cause is remanded to the trial court with directions to sentence the defendant to imprisonment for the time prescribed by law for murder of the second degree.

Gibson, C. J., Carter, J., Schauer, J., and Traynor, J., concurred.

SPENCE, J., Concurring and Dissenting.—While I agree with certain conclusions reached in the majority opinion, I cannot agree with the conclusion that the evidence is insufficient to support the conviction of first degree murder.

The majority concede that the evidence is ''unquestionably sufficient to support a conviction of second degree murder.'' In other words, it is conceded that there is ample evidence to sustain the charge that defendant unlawfully killed the deceased with malice aforethought (Pen. Code, § 187). But the majority conclude that the evidence is insufficient to support the conviction of murder of the first degree because, it is asserted, there is neither evidence of torture nor of deliberation and premeditation. (Pen. Code, § 189.) It is from this last mentioned conclusion that I must dissent, as well as from the decision which modifies the judgment of the trial court by reducing the degree of the crime to murder of the second degree.

It would serve no useful purpose to set forth the evidence in elaborate detail. A brief summarization and a statement of a few salient facts should suffice.

Defendant, who was a strong, young man of 29 years, weighing 175 pounds, and who had previously been convicted of the crime of manslaughter, administered a brutal, fatal beating upon his victim, who was a frail, elderly man of 82 years, weighing 95 pounds. The attack was unprovoked and continued over a period of about 15 minutes. It was in two distinct phases. Defendant administered the first blow upon his victim in the yard behind the house. When the neighbors shouted at defendant, he then, according to his statement to the police and to his own sworn testimony, ''drug him (the deceased) . . . by the hair of his head'' from the yard into the house. The various rooms of the house were the scenes of the second phase of the attack, which lasted until the officers arrived after being summoned by the neighbors. There

were no eyewitnesses to this phase of the attack but a neighbor testified that he heard bumping and thumping noises inside the house for 10 or 15 minutes. Defendant gave varying accounts of the occurrences within the house, telling different stories: first, to the officers following his arrest; second, upon the trial of the main issue; and third, upon the trial of the insanity plea. When confronted with these discrepancies upon the trial of the insanity plea, he was asked, ''What is the reason for changing your story?''; to which he answered, ''It may benefit me.''

The evidence clearly indicates that defendant chased his victim about the house inflicting terrific punishment upon him. There was blood on the porch, and on the walls and floor of practically every room in the house. The stove and stovepipe had been knocked out of place and some of the furniture had been broken during the affray. When the officers arrived, they found deceased had been beaten ''practically beyond recognition.'' Physical examination showed that deceased's nose ''was crushed almost flat''; that his eyes were swollen shut; that there was a fracture of the lower jaw and a complete fracture of the upper jaw; that there were several fractures of the skull; that the brain had been ''split completely open'' and ''was literally pulverized over the back portion of the two frontal sinuses.'' Other injuries were described by the doctors, including abdominal injuries, but the foregoing recital sufficiently shows the nature and severity of the resulting damage. The doctors further testified that this damage was far more extensive than is found as the result of a fall.

Defendant does not question the finding of the jury that he was sane when he committed this fiendish attack, and the only extenuating circumstance upon which he now relies is his claim that he was drunk as the time. The vice of the majority opinion rests in the fact that it accepts as true practically all of the evidence of defendant's witnesses regarding the extent of defendant's drinking and ignores the direct conflict in the evidence relating to his condition at the time in question. The arresting officers and the officers who talked with defendant immediately following his arrest testified that he was not drunk, and that he did not show any sign of intoxication. This testimony of the officers finds corroboration in defendant's ability to relate, when he saw fit to do so, the details of the struggle, and also in some of the evidence given by defendant's own witnesses. All conceded that defendant

walked straight and that he talked without thickness of tongue. On cross-examination, one of defendant's witnesses admitted that defendant "was not yet drunk" when he was taken home. Another admitted that she couldn't say that defendant was "drunk." The jury was therefore entirely justified in disbelieving the testimony of defendant's witnesses regarding the amount of drinking which defendant had done, and in concluding that defendant was not drunk when the crime was committed. Under these circumstances, it is not the province of a reviewing court to weigh the conflicting evidence and to accept as true the defendant's evidence which has been rejected by the jury.

Assuming then that the jury was justified in concluding that defendant was neither insane nor drunk and that he was therefore responsible for his acts at the time that he committed the murder, I am of the opinion that the jury was further justified in concluding that defendant was guilty of murder of the first degree. The evidence appears ample to show both that the murder was committed by torture, and that it was deliberate and premeditated. This was not a situation in which death was caused by a single act, such as strangulation, which the majority states is "not necessarily murder by torture," but it was a situation in which there was a prolonged attack involving numerous, merciless blows, which attack was broken into two phases by the interval during which defendant dragged the deceased by the hair of his head from the yard into the house. Accepting the tests set forth in the majority opinion, the jury was justified here in concluding that there was "an intent to cause pain and suffering in addition to death"; that "the killer [was] not satisfied with killing alone"; that "the assailant's intent was to cause cruel suffering on the part of the object of the attack." If the dragging of a person by the hair of the head for a considerable distance during the progress of a prolonged beating, such as that inflicted by defendant upon his victim, is insufficient to sustain a finding of the necessary intent to torture (that is, to cause cruel pain and suffering in addition to death), it is difficult to determine where the majority would draw the line. Furthermore, the jury was likewise justified in finding from all the evidence that the interval between the first blow delivered in the yard and the remaining blows delivered in the house gave ample time for deliberation and premeditation, and that defendant thereafter proceeded to kill his victim, not alone "with malice aforethought" (Pen.

Code, § 187), but also with that deliberation and premeditation which characterizes the crime as murder of the first degree. (Pen. Code, § 189.)

In my opinion, both the judgment of conviction and the order denying the motion for a new trial should be affirmed.

Edmonds, J., concurred.