[Crim. No. 19247. Oct. 4, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
THERESA WILEY, Defendant and Appellant.

**Counsel**

Donavon R. Marble, under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Derald E. Granberg and Sanford Svetcov, Deputy Attorneys General, for Plaintiff and Respondent.

**Opinion**

**WRIGHT, C. J.**—Defendant Theresa Wiley appeals from a judgment entered upon a jury verdict of first degree murder. (Pen. Code, §§ 187, 189.)[1] She contends that the trial court erred in instructing the jury that

---

[1] Unless otherwise stated, all statutory references are to sections of the Penal Code.

she could be convicted of first degree murder on the basis of murder by torture;[2] that the standard instruction on circumstantial evidence was erroneously omitted; and that certain limiting instructions were also omitted. We have concluded that none of these contentions has merit, and accordingly affirm the judgment.

The relevant events occurred on the afternoon and evening of December 10, 1973, and the day of December 11, 1973. In the early afternoon of December 10th, in response to a "domestic disturbance" call, Officer Hendrix of the Oakland Police Department went to the home which appellant shared with her husband, William Wiley. Appellant, her brother Andrew Henry, and her husband were present. Appellant, whom Officer Hendrix described as physically agitated, accused her husband of having stolen $31 from her. When Officer Hendrix refused her request that he arrest William, appellant declared, "If you don't get my $31 back, I am going to kill him." Officer Hendrix understood this threat to be directed to William. He took William outside and suggested that he take a walk until appellant calmed down. William then walked away as the officer departed.

Officer Hendrix returned to the Wiley home 24 hours later. Andrew Henry met him at the door and told him that William was sick and would not wake up. The officer found William sitting, slumped over, in a chair in the bedroom. William was dead.

Expert testimony established that the cause of death was shock and hemorrhage due to trauma caused by a blunt instrument. Thirty fresh wounds, many of which were head injuries, were found on the body. Ten of the wounds were of sufficient severity as to have been the cause or to have contributed to the cause, of death. Some were consistent with the type of injury inflicted by a blunt instrument similar to a baseball bat. Others could have been made by the claws of a hammer while some could have been made by the rounded head of a hammer. William had a blood alcohol level of .36 percent at the time of his death.

Prior to the arrival of Officer Hendrix on December 11th, Myrtle Mills, a friend of appellant, had found a baseball bat and a hammer

---

[2]Section 189 provides: "All murder which is perpetrated by means of a destructive device or explosive, poison, lying in wait, torture, or by any other kind of wilful, deliberate, and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, mayhem, or any act punishable under Section 288, is murder of the first degree; and all other kinds of murders are of the second degree. [¶] . . . ."

under the bed in the room in which William's body was seated. She saw another person bring a second bat from the rear of the house to the bedroom. Both bats and the hammer had been taken from the house and disposed of by other persons.

Appellant testified that when her husband returned to the house on December 11th, Andrew Henry had asked her if she wanted Henry to get her money back. She replied "yes," after which Henry commenced hitting William on the head with his fists. Then, in response to requests from Henry, she handed him first a baseball bat, and next a hammer, which Henry used in turn to strike William on all parts of his body. Appellant knew that Henry was "beating him bad," but not that "he was beating him that bad, that hard." Appellant denied hitting William with the hammer herself, but admitted that she had asked Henry for the bat, stating that she was going to hit William "on the hand, because that is the hand which spent my money, which is his right hand." She testified that she had hit him on the right hand and on the knee with the bat. She also testified that she had not asked Henry to hit William, but gave him the bat "because he asked for it" and she did not "really think he was hurting him that bad." She claimed that when she hit William she did not intend to hurt him.

Henry, who was also charged with murder, and who was subsequently tried and convicted, exercised his right to remain silent. A prior out of court statement by Henry was admitted, however, in which Henry asserted that appellant rather than he had used the bat first; that he had not used the hammer; and that William had looked worse the next day than he had when Henry left on the night of December 10th.

The People proceeded on the basis that appellant was guilty as an aider and abettor of first degree murder on either of two theories—(1) that the killing of William was wilful, deliberate, and premeditated; and/or (2) that the killing was perpetrated by torture in that the death was caused by acts involving a high degree of probability of death undertaken with the intent to inflict cruel pain and suffering for the purpose of revenge or extortion.

I

*The Elements of Murder by Torture*

The trial court instructed the jury in the language of CALJIC No. 8.24 that: "Murder which is perpetrated by torture is murder of the first

degree. [¶] The essential elements of such a murder are (1) the act or acts which caused the death must involve a high degree of probability of death, and (2) the defendant must commit such act or acts with the intent to cause cruel pain and suffering for the purpose of revenge, extortion, persuasion or for any other sadistic purpose. [¶] The crime of murder by torture does not necessarily require any proof that the defendant intended to kill the deceased, nor does it necessarily require any proof that the deceased suffered pain."

Appellant argues both that the evidence was insufficient to warrant an instruction on murder by torture because there was no evidence that she intended that William suffer, and that the instruction quoted misstates the law in reciting that it is unnecessary that the victim of torture-murder actually have felt pain. ■ She correctly notes that murder by torture cannot be inferred solely from the condition of the victim's body (*People v. Beyea* (1974) 38 Cal.App.3d 176, 201 [113 Cal.Rptr. 254]), or from the mode of assault or injury suffered (*People v. Tubby* (1949) 34 Cal.2d 72, 77 [207 P.2d 51]), but other evidence of intent to cause suffering is also required. (*People v. Anderson* (1965) 63 Cal.2d 351, 359-360 [46 Cal.Rptr. 763, 406 P.2d 43]; *People v. Caldwell* (1955) 43 Cal.2d 864, 868-869 [279 P.2d 539].) Here the evidence was clearly sufficient to permit the trier of fact to find such intent. Both her own statement that she wanted to hit William on the hand that stole her money, and her response to Henry's question whether she wanted him to get her money back from William, when considered with the manner in which the beating to William was administered, permit an inference that the purpose of the beating was to cause pain.

■ Appellant's argument that actual awareness of pain by the victim is a necessary element of torture-murder finds no support in the reported cases that have interpreted and applied the torture-murder provision since it was added to the predecessor statute to section 189 in 1856. The history of section 189 and our construction of its language establish that this type of murder was categorized as first degree murder because the Legislature intended that the *means* by which the killing was accomplished be equated to the premeditation and deliberation which render other murders sufficiently reprehensible to constitute first degree murder. ■ A murder by torture was and is considered among the most reprehensible types of murder because of the calculated nature of the acts causing death, not simply because greater culpability could be attached to murder in which great pain and suffering are caused to the

victim. (*People* v. *Steger* (1976) 16 Cal.3d 539, 544-546 [128 Cal.Rptr. 161, 546 P.2d 665].)

When enacted in 1850, section 19 of the Act Concerning Crimes and Punishment (Stats. 1850, ch. 99, p. 231), the predecessor to section 189, did not divide murder into degrees, but defined murder as "the unlawful killing of a human being, with malice aforethought, either express or implied." Section 21 of the act defined malice and provided the sole penalty for murder, death. Possibly because juries were reluctant to convict defendants of murder when the penalty was so severe and the relative culpability of defendants quite disparate, the offense was divided into degrees by an 1856 amendment to the act. As amended, section 21 provided: "Malice shall be implied when no considerable provocation appears or when all the circumstances of the killing show an abandoned and malignant heart. All murder which shall be perpetrated by means of poison, or lying in wait, torture, or by another kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery or burglary, shall be deemed murder of the first degree; and all other kinds of murder shall be deemed murder of the second degree; and the jury before whom any person indicted for murder shall be tried, shall, if they find such person guilty thereof, designate by their verdict, whether it be murder of the first or second degree; but if such person shall be convicted on confession in open court, the court shall proceed, by examination of witnesses, to determine the degree of the crime and give sentence accordingly. Every person convicted of murder of the first degree, shall suffer death, and every person convicted of murder of the second degree shall suffer imprisonment in the State Prison for a term not less than ten years and which may extend to life." (Stats. 1856, ch. 139, § 1, p. 219.)

We first had occasion to construe the amended definition of murder in *People* v. *Bealoba* (1861) 17 Cal. 389, 393-394. It was argued there that under the amended section 21 first degree murder encompassed only murder by acts such as poison, lying in wait or torture, "the latter words being mere examples of the class of murder intended to be embraced; and the clause, therefore, not including other murders than those characterized by the same or similar proofs of deliberation." We rejected the argument, stating: "But this was not the meaning of the Legislature. The acts of homicide by poison, etc., carry with them conclusive evidence of premeditation, and the jury would have no option but to find the prisoner guilty in the first degree, upon proof of the crime; but it does

not follow that the same result should not flow when other proof of deliberation than that afforded by these circumstances existed. For the statute is express, that '*all other* kind of deliberate, willful and premeditated murder is murder in the first degree.' To fall within this class, the crime must be premeditated, willful, and deliberate."

We adhered to this interpretation in *People* v. *Belencia* (1863) 21 Cal. 544, in which we held that evidence of intoxication was admissible as tending to show the "mental status" of a murder defendant if "the means employed in the killing were not such as to give character to the offense," (21 Cal. at p. 545) since intoxication did go to whether the act was deliberate and premeditated.

Then, in *People* v. *Sanchez* (1864) 24 Cal. 17, we offered the interpretation of section 21 that was the law when section 189 was later adopted, and which was incorporated into the Code Commissioners' notes explaining section 189 when the Penal Code of 1872 was presented to the Legislature for adoption: "In dividing murder into two degrees, the Legislature intended to assign to the first, as deserving of greater punishment, all murders of a cruel and aggravated character; and to the second all other kinds of murder which are murder at common law; and to establish a test by which the degree of every case of murder may be readily ascertained. That test may be thus stated: Is the killing wilful, (that is to say, intentional,) deliberate, and premeditated? If it is, the case falls within the first, and if not, within the second degree. There are certain kinds of murder which carry with them conclusive evidence of premeditation. These the Legislature has enumerated in the statute, and has taken upon itself the responsibility of saying that they shall be deemed and held to be murder of the first degree. These cases are of two classes. First—Where the killing is perpetrated by means of poison, etc. Here the *means* used is held to be conclusive evidence of premeditation." (24 Cal. at p. 29. Italics in original.)

The Code Commissioners' Note advised as to section 189: "This section is founded upon Sec. 21 of the Crimes and Punishment Act, as amended by the Act of 1856.—Stats. 1856, p. 219. The Commission made no material change in the language. . . . After all that had been written upon this topic, it remained for the Supreme Court of this State to be the first to draw the distinction between the two degrees of murder, in language so clear, explicit, and satisfactory as to put the matter forever at rest." The Commissioners then set out the above quotation from *Sanchez.*

■ When a statute proposed by the California Code Commission for inclusion in the Penal Code of 1872 has been enacted by the Legislature without substantial change, the report of the commission is entitled to great weight in construing the statute and in determining the intent of the Legislature. (*Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 630 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420].) The hope of the commissioners that the matter of distinguishing the degrees of murder had been laid forever to rest with our opinion in *Sanchez* as the guide to interpretation of section 189, has been largely fulfilled with respect to torture-murder during the intervening century. Although torture-murder received passing mention in subsequent cases,[3] until 1934 no case came before this court in which the possibility of murder by torture was in issue. In *People* v. *Murphy* (1934) 1 Cal.2d 37 [32 P.2d 635], the defendant, who had "by the use of a belt, belt buckle and his fists . . . bruised and battered his victim's entire body and had broken her jaws," offered a diminished capacity defense based on intoxication. On appeal he argued that the evidence was insufficient to establish first degree murder since he was incapable of forming a wilful, deliberate, and premeditated intent to kill. We held the evidence sufficient, but also noted that the judgment could be affirmed as a torture-murder in which "the means used is held to be conclusive evidence of premeditation . . . ." (1 Cal.2d at p. 41.) Consistent with *Sanchez,* the means used were equated with the element of premeditation otherwise required in first degree murder. There was no suggestion that any additional element such as pain was necessary in first degree murder by torture.

That the victim's awareness of pain is not an element of first degree murder by torture is also suggested by *People* v. *Bender* (1945) 27 Cal.2d 164 [163 P.2d 8]. In *Bender* the victim had been strangled, which was a contributing cause of death, and had also been hit on the head or had fallen and hit her head causing the injury which was the immediate cause of death. In response to an argument by the People that the evidence compelled an inference of first degree murder by torture we

---

[3]See, e.g., *People* v. *Milton* (1904) 145 Cal. 169, 170 [78 P. 549], which adhered to the *Sanchez* interpretation: "In section 189 of the Penal Code three kinds or classes of murder in the first degree are specifically enumerated: 1. All murder which is perpetrated by means of poison, or lying in wait, or torture is murder in the first degree; . . . Of the first of these classes it is sufficient to note that the means adopted for the unlawful killing furnish evidence of willfulness, deliberation, and premeditation, and this is made perfectly plain by the context of the section which declares to be murder in the first degree all murder which is perpetrated by these means, or by *any other kind* of willful, deliberate, and premeditated killing."

again pointed out that it is the intent to cause pain, not actual suffering of the victim, that the Legislature deemed sufficiently culpable to render the killing murder of the first degree. Rejecting the People's claim we stated: "The killer who, heedless of the suffering of his victim, in hot anger and with the specific intent of killing, inflicts the severe pain which may be assumed to attend strangulation, has not in contemplation of the law the same intent as one who strangles with the intention that his victim shall suffer." (*Id.,* at p. 177.)

*People* v. *Tubby, supra,* 34 Cal.2d 72, principally relied on in support of their conflicting positions by appellant and respondent, did not change this long accepted interpretation of section 189. Appellant there argued that the evidence was insufficient to support a first degree murder verdict. The People argued that because the evidence of infliction of multiple injuries as a result of continued beating of the victim indicated an intent to inflict pain and suffering, the acts could constitute torture within the meaning of the section. We acknowledged the dictionary definition of torture as the " 'Act or process of inflicting severe pain, esp. as a punishment in order to extort confession, or in revenge,' " and repeated a definition of torture that had appeared in our original opinion in a case reported on rehearing as *People* v. *Heslen* (1946) 27 Cal.2d 520 [165 P.2d 250]. We noted that in *Heslen* we had "appropriately enlarged upon" the dictionary definition of torture when we had said: " 'Implicit in that definition is the requirement of an intent to cause pain and suffering in addition to death. That is, the killer is not satisfied with killing alone. He wishes to punish, execute vengeance on, or extort something from his victim, and in the course, or as the result of inflicting pain and suffering, the victim dies. That intent may be manifested by the nature of the acts and circumstances surrounding the homicide.' " (34 Cal.2d at 77.) It is suggested that this language with the sentence next following in *Tubby* establish that pain felt by the victim is a necessary element of torture-murder. The sentence in question recited that: "The Colorado Supreme Court has declared in similar terms that as an essential of torture physical pain must be inflicted as a means of persuasion, punishment or in revenge." However, the question before the court in *Tubby* was not whether pain was a necessary element of torture-murder, but whether the appellant was shown to have had the intent to cause pain. We explained: "In determining whether the murder was perpetrated by means of torture the solution must rest on whether the assailant's intent was to cause cruel suffering on the part of the object

of the attack, either for the purpose of revenge, extortion, persuasion, or to satisfy some other untoward propensity. The test cannot be whether the victim merely suffered severe pain since presumably in most murders severe pain precedes death." *(Id.)* (See also, *People* v. *Daugherty* (1953) 40 Cal.2d 876, 898 [256 P.2d 911]; *People* v. *Martinez* (1952) 38 Cal.2d 556, 561 [241 P.2d 224]; *People* v. *Cooley* (1962) 211 Cal.App.2d 173, 205 [27 Cal.Rptr. 543].)

Most recently we had occasion to review a conviction of first degree murder predicated on torture in *People* v. *Steger, supra,* 16 Cal.3d 539. In holding the evidence of intent to inflict pain insufficient to support the verdict on that theory we again emphasized that "it is not the amount of pain inflicted which distinguishes a torturer from another murderer, as most killings involve significant pain. [Citation.] Rather, it is the state of mind of the torturer—the cold-blooded intent to inflict pain for personal gain or satisfaction. . . . [W]e hold that murder by means of torture under section 189 is murder committed with a wilful, deliberate, and premeditated intent to inflict extreme and prolonged pain." (16 Cal.3d at p. 546.)[4]

██ We adhere to these holdings. Attempts to measure the amount of pain, if any, suffered by victims of torturous acts, some of whom like William, may have been rendered insensitive to pain by alcohol or drugs, others of whom mercifully may have been quickly rendered unconscious at the outset of the homicidal assault, not only promises to be futile, but are unnecessary. The Legislature did not make awareness of actual pain an element of torture-murder. Although it has been assumed in past opinions in torture-murder cases that the victim probably felt pain, it does not follow that awareness of pain is an element of the offense. The murderer who exhibits "the cold-blooded intent to inflict pain for personal gain or satisfaction" may not assert the victim's condition as a fortuitous defense to his own deplorable acts. The challenged instruction correctly states the elements of murder by torture.

---

[4]Our use, in *Steger*, of the words "wilful, deliberate, and premeditated intent to inflict extreme and prolonged pain," refers only to the requirement that before the trier of fact may convict a defendant of first degree murder by torture there must be found a cold-blooded, calculated intent to inflict such pain for one of the specified purposes. Inasmuch as the Legislature has equated this state of mind with the wilful, deliberate, premeditated intent to kill that renders other murders sufficiently culpable to be classified as first degree murder, it is unnecessary in torture-murder to also find that the killing itself was "wilful, deliberate, and premeditated."

## II

### *Instructions on Circumstantial Evidence*

 Appellant also contends that the trial court committed prejudicial error in failing to instruct the jury, *sua sponte,* on the effect to be given circumstantial evidence. She argues that because there was no evidence that she struck the fatal blow, and because proof of the mental elements of murder in this case involved a substantial amount of circumstantial evidence, the court should have instructed the jury in the language of CALJIC No. 2.01 that: "You are not permitted to find the defendant guilty of the crime charged against him based on circumstantial evidence unless the proved circumstances are not only consistent with the theory that the defendant is guilty of the crime, but cannot be reconciled with any other rational conclusion and each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt has been proved beyond a reasonable doubt.

"Also, if the evidence is susceptible of two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, it is your duty to adopt the interpretation which points to the defendant's innocence, and reject the other which points to his guilt."

 It is the duty of the trial court to instruct on general principles of law relevant to the issues raised by the facts of the case before it. (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 715-716 [112 Cal.Rptr. 1, 518 P.2d 913].) This obligation includes the duty to instruct on the effect to be given circumstantial evidence but only when circumstantial evidence is "substantially relied on for proof of guilt." (*People* v. *Yrigoyen* (1955) 45 Cal.2d 46, 49 [286 P.2d 1].) The instruction should not be given "when the problem of inferring guilt from a pattern of incriminating circumstances is not present." (*People* v. *Gould* (1960) 54 Cal.2d 621, 629 [7 Cal.Rptr. 273, 354 P.2d 865].) Extrajudicial admissions, although hearsay, are not the type of indirect evidence as to which the instructions on circumstantial evidence are applicable. (*Id.*)

In *People* v. *Yrigoyen, supra,* 45 Cal.2d 46, there was conflicting evidence with respect to the intent of a defendant charged with issuing a check without sufficient funds in violation of section 476a to defraud the payee. We held that in those circumstances, because the evidence was also consistent with a rational conclusion that the defendant was

innocent, failure to give the instruction was error that had resulted in a miscarriage of justice. ■ The fact that the elements of a charged offense include mental elements that must necessarily be proved by inferences drawn from circumstantial evidence does not alone require an instruction on the effect to be given such evidence however. The contrary is usually the rule. Thus, in *People* v. *Malbrough* (1961) 55 Cal.2d 249 [10 Cal.Rptr. 632, 359 P.2d 30], we held that the instruction was not necessary where the evidence of the defendant's guilt of grand theft was primarily direct evidence given by eyewitnesses who observed defendant as he restrained the victim while his codefendant reached first into the victim's pockets and then into his own pocket in which a wad of bills was later found. There was no suggestion in *Malbrough* that instructions on circumstantial evidence were necessary because the defendant's intent to permanently deprive the victim of his property had to be inferred from the circumstances of the taking. Similarly, in *People* v. *Gould, supra,* 54 Cal.2d 621, the defendant who had been convicted of burglary contended on appeal that such instructions should have been given because his identification was based in part on an extrajudicial admission. We held the instructions on circumstantial evidence to be unnecessary because they were inappropriate and thus inapplicable to extrajudicial admissions, and affirmed the judgment even though intent to commit a felony or petty theft at the time of the entry is an element of burglary (§ 459) that necessarily had to be proved by inference drawn from the direct evidence of defendant's conduct. (See also, *People* v. *Zurica* (1964) 225 Cal.App.2d 25 [37 Cal.Rptr. 118]; *People* v. *Masters* (1963) 219 Cal.App.2d 672 [33 Cal.Rptr. 383].)

■ In the instant case the instructions were unnecessary because the People did not "substantially rely" on circumstantial evidence, and, unlike the situation in *Yrigoyen,* the evidence as to the mental elements of murder was either direct evidence, or if circumstantial was not equally consistent with a rational conclusion that appellant was innocent of murder under either of the theories pursued by the People.

Whether appellant personally struck the blow or blows that caused the death of William was not relevant to her guilt since she admitted acts which established that she aided and abetted Henry. (§ 31; *People* v. *Gonzales* (1970) 4 Cal.App.3d 593, 599 [84 Cal.Rptr. 863].) Thus her argument that there was no direct evidence that she struck the fatal blow is not a basis for an instruction on circumstantial evidence. Direct evidence of malice was offered in her statement to Officer Hendrix that

she would kill William if he did not return her money. Her testimony regarding the commission of acts highly dangerous to human life by Henry, with her assistance, was evidence of implied malice. (§ 188.) The statement to Officer Hendrix is also evidence of premeditation. The purpose that is an element of murder by torture, here revenge or extortion, was also established by her own testimony, and that of Officer Hendrix.

Appellant denied that she intended to cause William cruel pain and suffering, although she admitted that she realized that Henry's acts would cause pain. Her intent in this regard therefore was necessarily based on inferences drawn from the circumstances in which the homicidal attack on William occurred and the means by which the beating was administered. However, the purpose and manner of the beating having been established, the evidence was not reasonably susceptible of an interpretation that there was no intent to cause cruel pain and suffering. Thus, it cannot be said that the People substantially relied on circumstantial evidence, or that the nature of the circumstantial evidence relied on was such that it was equally consistent with a reasonable conclusion that appellant was innocent of first degree murder on a murder by torture theory.

■ Appellant's additional claims, that the trial court should have given a limiting instruction regarding the tape-recorded statement by Henry in which there was a reference to prior offense or bad conduct of appellant, and regarding the bat and hammer admitted into evidence lack merit. Since she herself introduced the tape-recorded statement she cannot now be heard to complain that its content was inadmissible for some purposes. (*People* v. *Sirhan* (1972) 7 Cal.3d 710, 746 [102 Cal.Rptr. 385, 497 P.2d 1121]; *People* v. *Moran* (1970) 1 Cal.3d 755, 762 [83 Cal.Rptr. 411, 462 P.2d 763].) ■ The court properly advised the jury at the time the bat and hammer were admitted that they were being admitted for illustrative purposes only. Appellant contends that this advice should have been given when the exhibits were initially identified and displayed to a witness who testified that they resembled the implements taken from beneath appellant's bed. Even if we assume that the prosecutor had some duty to advise the court, or that the court then had some basis for divining that the items were not to be later identified as the actual murder weapons, we find no prejudice to appellant. The court's admonition to the jury at the time that the items were admitted was adequate to avoid the potential inflammatory effect about which appellant now speculates.

Appellant also suggests that it was improper to admit these items even for illustration. Not only was there no objection to their admission, but a proper foundation having been laid their admission was within the sound discretion of the trial court. (*People* v. *Cavanaugh* (1955) 44 Cal.2d 252, 267 [282 P.2d 53]; *People* v. *Ham* (1970) 7 Cal.App.3d 768, 769 [86 Cal.Rptr. 906].)

The judgment is affirmed.

McComb, J., Tobriner, J., Mosk, J., and Clark, J., concurred.