Filed 3/16/26

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, <br><br>     Plaintiff and Respondent, <br><br> v. <br><br> MORGAN JAMES DUNN, <br><br>     Defendant and Appellant. | A172594 <br><br> (Humboldt County <br> Super. Ct. Nos. CR2300341, <br> CR1505239). |

A jury convicted Morgan James Dunn of four counts of unlawful firearm possession and five counts of unlawful ammunition possession under Penal Code sections 29800, subdivision (a)(1), and 30305, subdivision (a)(1). On appeal, Dunn argues the trial court made two instructional errors. First, he contends the court should have instructed the jury, sua sponte, on how to evaluate circumstantial evidence because, in his view, his guilt depended almost entirely on circumstantial evidence that he lived in the cabin where the guns and ammunition were found. Second, he contends the court erred by giving the jury a unanimity instruction regarding the firearm counts even though no single count alleged that Dunn possessed more than one firearm. Dunn argues that the first alleged error warrants reversal of his convictions on all nine counts and that the second alleged error warrants reversal of his convictions on three of the four firearm counts. Alternatively, he argues that

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II and III.

the combined effect of the two alleged errors resulted in prejudice requiring reversal of all nine counts. Finding no instance of prejudicial error, and no cumulative prejudice warranting reversal, we affirm.[1]

## BACKGROUND

In 2022, Dunn lived in Hideaway Hills, a 40-acre property with multiple cabins located at the single street address 284 Pine Drive. Each cabin had a specific number, but not all of them were marked. Dunn served as a caretaker of the property. He had a felony conviction that prevented him from legally possessing firearms or ammunition.

Another Hideaway Hills resident, Sheila Castillo, testified that she believed Dunn lived in a particular cabin on the property for about two years after having replaced the prior caretaker. Although she did not know the number of the cabin, she identified it on a map and described its appearance and location. She testified that she had seen him come and go from the cabin, she saw him inside it "[a]lmost every day" when she was passing by in her car, and she had seen him bring his dogs inside. She said that the dogs lived in the cabin and that Dunn parked a truck in front of it. She believed that he slept in the cabin because she saw the bedroom light on at night. Castillo also testified that she once saw Dunn carrying a black or blackish rifle.

In July 2022, Deputy Sheriff Nathan Cumbow responded to a call from Hideaway Hills. When he arrived, he saw Dunn waiting for him in a truck parked in front of the same cabin identified by Castillo. Dunn got out of the truck, and he and Cumbow spoke in front of the cabin.

---

[1] We grant Dunn's unopposed motion to amend his notice of appeal to include case number CR1505239, a probation violation case related to case number CR2300341.

2

In August, Deputy Sheriff Seth Crosswhite attempted to serve process on Dunn. The service papers indicated that Dunn lived in Hideaway Hills at cabin number 4. When Crosswhite arrived at Hideaway Hills, one of the first cabins he came to was the one presumed by Castillo to be Dunn's residence. As he approached, a woman came out of the cabin. Crosswhite testified that when he asked if Dunn lived there, she said no and directed him to a different group of residences on the property. He did not learn her name, and she did not testify at trial. Crosswhite did not find Dunn at another cabin or group of cabins.

In September, Castillo enlisted the help of another neighbor, Valerie,[2] to serve Dunn with a restraining order. Castillo testified that she watched Valerie go to the cabin to give Dunn the papers. Dunn was there but he would not take them, so she left them on the porch. Castillo heard Dunn tell Valerie to leave.

Around the same time, likely after Castillo and Valerie's attempted service, three sheriff's deputies, including Deputy Cumbow (but not including Deputy Crosswhite), came to Hideaway Hills looking for Dunn regarding outstanding warrants. They spoke to Castillo, who identified the cabin as Dunn's residence. Based on that conversation, and because that is where Cumbow had met Dunn, they believed that Dunn lived in the cabin. One of the deputies testified that he did not recall a visible number associated with the cabin. They knocked on the doors and announced their presence, but nobody answered. The deputies entered the cabin through an unlocked sliding glass door.

In some ways, the inside of the cabin appeared unfinished or bare. The living room walls had no personal effects. Above a shop-vac, one wall had a

---

[2] The record does not contain Valerie's last name.

hole with exposed electrical wires. The walls were incompletely painted, with some exposed drywall. There was a light switch without a cover plate, there appeared to be an exposed electrical panel, and a ceiling light fixture had been removed. One of the deputies testified that the state of the cabin was not extreme and that most of the hundreds of residences he had searched were in more disarray.

The cabin showed signs of use. It had working electrical power. In the kitchen, the deputies found food, a plugged-in hot plate, plates, soda cans, trash in a trash bag, and salt and pepper shakers. In the living room, the deputies found dog bowls with dog food in them, water bowls with water in them, two dog cages, bags of dog food, and a tug-of-war dog toy. One bedroom had a bed with sheets, blankets, pillows, and sleeping bags. It also had folded clothes, shoes, and slippers that appeared to be larger than size 13. In addition, the backside of the cabin had bins with cans and other recyclables in them.

On the kitchen counter, the deputies found mail and papers with Dunn's name on them. These included a fictitious business statement signed by Dunn, two vehicle-registration cards, a vehicle pink slip, a letter from PG&E, a transmission-work receipt, and insurance paperwork. Some of the papers showed the Hideaway Hills street address of 284 Pine Drive, and others showed different addresses. The letter from PG&E showed the 284 Pine Drive address and specifically designated "No. 14."

On the nightstand of the bedroom with the furnished bed, the deputies found a wallet. It contained Dunn's driver's license, an identification card in his name, and multiple credit cards in his name.

In the closet of the same bedroom, the deputies found four firearms and ammunition. The firearms consisted of the following: an AR-15 rifle; a black

4

12-gauge, pump-action shotgun; a camouflage 12-gauge, pump-action shotgun; and a shotgun with a sawed-off barrel. All of them were loaded. The deputies could see the shotguns and the butt of the AR-15 rifle when they walked into the room. Along with the firearms, the deputies found two cannisters or canteens with five types of ammunition compatible with the firearms.

Next to the ammunition in the closet, the deputies found clear plastic containers. The containers held DMV records with Dunn's name on them, his birth certificate, and a bible with his name written inside the front cover.

Following the deputies' search, the district attorney filed an information charging Dunn with four counts of unlawful possession of a firearm. Each count related to one of the four firearms found in the cabin. The information also charged Dunn with five counts of unlawful possession of ammunition.

At Dunn's trial, the parties stipulated that Dunn had been previously convicted of a felony, that the deputies' search of the cabin was lawful, and that there were no fingerprints on the firearms.

The court instructed the jury about direct and circumstantial evidence, using CALCRIM No. 223, which defines those types of evidence and explains that either or both can be used to prove a fact. It did not use CALCRIM No. 224, which discusses the sufficiency of circumstantial evidence to prove a defendant's guilt.

For the firearm counts, using CALCRIM No. 2511, the court instructed the jury that the People needed to prove that Dunn (1) possessed a firearm, (2) knew he possessed the firearm, and (3) had been convicted of a felony. The court explained that "[a] person does not have to actually hold or touch something to possess it. It is enough if the person has control over it or the

5

right to control it, either personally or through another person." The court told the jury that the parties had stipulated that Dunn previously had been convicted of a felony.

Continuing to use CALCRIM No. 2511, the court instructed, "[t]he People allege that the defendant possessed the following firearms: One, a black shotgun; two, a camo shotgun; three, an AR-15 rifle; four, a break-action shotgun." It further instructed, "[y]ou may not find the defendant guilty unless all of you agree that the People have proved that the defendant possessed at least one of the firearms, and you all agree on which firearm he possessed."

The jury returned guilty verdicts on all nine counts.

## DISCUSSION

## I.

Dunn contends the court erred by failing to use CALCRIM No. 224, sua sponte, to instruct the jury how to evaluate the circumstantial evidence in the case. We agree, but we find that the error was harmless.

## A.

A trial court must instruct the jury "on the general principles of law relevant to the issues raised by the evidence" even in the absence of a request. (*People v. Breverman* (1998) 19 Cal.4th 142, 154 .) We examine without deference a trial court's decision whether to give a particular jury instruction. (*People v. Waidla* (2000) 22 Cal.4th 690, 733.)

CALCRIM No. 224 provides: "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt." It continues: "Also, before you may rely on circumstantial evidence to find the defendant guilty,

you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty.  If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence.  However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

In *People v. Yrigoyen* (1955) 45 Cal.2d 46 (*Yrigoyen*), the California Supreme Court stated that a trial court must sua sponte give an instruction on the principles in CALCRIM No. 224 when "circumstantial evidence is substantially relied upon for proof of guilt . . . ." (*Yrigoyen* at p. 49, citing *People v. Bender* (1945) 27 Cal.2d 164, 175, overruled on other grounds in *People v. Lasko* (2000) 23 Cal.4th 101, 110; see *People v. Rogers* (2006) 39 Cal.4th 826, 885–886 (*Rogers*).)  Citing *People v. Wiley* (1976) 18 Cal.3d 162, the Attorney General argues that even if the prosecution substantially relies on circumstantial evidence, a trial court does not err by failing to give the instruction when the circumstantial evidence is "not equally consistent with a rational conclusion" of innocence.  (*Id.* at p. 175.)  While the Supreme Court has not expressly repudiated that language, in more recent decisions it has instead hewed to the approach first set forth in *Yrigoyen.*  In *Rogers*, the court considered only whether the prosecution had substantially relied on circumstantial evidence, and, answering that question in the affirmative, concluded the trial court erred by failing to give the instruction.  (*Rogers*, at p. 885.)  It reached this conclusion even though it found the error harmless because the circumstantial evidence was "strong" and, indeed, not even susceptible to a reasonable interpretation pointing to the defendant's innocence.  (*Id.* at p. 886.)  *Rogers's* finding of error thus calls into question

7

the continuing viability of any view that the instruction need not be given if the circumstantial evidence is not equally consistent with a rational conclusion of innocence. Similarly, in a case addressing the CALJIC instructions for circumstantial evidence in the context of special circumstances, the high court's conclusion that the prosecution substantially relied on circumstantial evidence to prove the lying-in-wait special circumstance was sufficient to compel the conclusion that the trial court erred by failing sua sponte to give the instructions. (*People v. Sandoval* (2015) 62 Cal.4th 394, 417–421 (*Sandoval*).)

Here, the prosecution's case rested on multiple items of circumstantial evidence. No one saw Dunn in possession or control of the firearms or ammunition. Even Castillo's testimony that she saw Dunn with a black rifle is not direct evidence that Dunn possessed one of the specific firearms at issue. Therefore, the trial court erred by failing to instruct the jury with CALCRIM No. 224.

## B.

We next consider whether there is a reasonable probability the outcome would have been more favorable to Dunn if the instruction had been given. (*Rogers, supra*, 39 Cal.4th at p. 886 [citing *People v. Watson* (1956) 46 Cal.2d 818, 836, for standard of prejudice]; *Sandoval, supra*, 62 Cal.4th at pp. 421–422 [same].) We conclude the answer is no.

As described above, Castillo's testimony established Dunn's regular presence in the cabin, and the deputies' testimony furnished evidence that the cabin was inhabited and contained Dunn's personal papers and items, including in the same closet where the firearms and ammunition were found. The shotguns, and the butt of the AR-15 rifle, were in plain view from the bedroom where Dunn's wallet lay on the nightstand.

8

This evidence strongly supports the jury's guilty verdicts. Dunn offers four alternative possibilities that he says could be supported by the evidence, but they are neither reasonable inferences from the evidence nor would they point toward his innocence. Before addressing each alternative in turn, we note that the jury did not need to conclude that Dunn lived in the cabin, or that no one else lived in the cabin, to find Dunn guilty. It needed to conclude only that Dunn had control over the firearms and ammunition in the closet.

First, Dunn argues that the evidence supports a conclusion that no one lived in the cabin, in particular evidence that parts of the cabin's interior were bare, unfinished, or being worked on. But one deputy testified that it looked as though someone lived there, and another testified that, of the hundreds of residences he had searched, most were in more disarray than the cabin. Moreover, to accept Dunn's proposed explanation, the jury would need to disregard piece after piece of evidence showing that someone ate, slept, and kept dogs in the cabin; Dunn spent significant time in the cabin; and Dunn kept important paperwork and personal items there, including in the closet where the firearms and ammunition were found. Even if the jury were to conclude that Dunn formally resided elsewhere—perhaps based on some of the paperwork on the kitchen counter showing different addresses—it still would not be reasonable for the jury to conclude that Dunn did not have access to the cabin, that he did not spend significant time there, that he did not store important personal items in the bedroom closet, and that he thus did not have control over the firearms and ammunition found inside.

Second, Dunn proposes that evidence supports a conclusion that someone else lived in the cabin. He points out that there was conflicting evidence about what number cabin Dunn lived in and no evidence was introduced about the size or gender characteristics of the clothes found in the

9

cabin. Dunn also relies on Deputy Crosswhite's testimony that an unidentified woman came out of the cabin and told him that Dunn lived in a different group of cabins on the property (although the deputy did not find Dunn living in another cabin). But it would not have been reasonable for the jury, based on the evidence Dunn cites, to disregard Castillo's testimony about Dunn's presence at the cabin, as corroborated by his personal effects found inside. Moreover, as noted, the possibility that someone else *also* lived in the cabin is not inconsistent with an inference that Dunn lived in the cabin, or at a minimum had access to and control over the items in the closet.

Third, Dunn argues that one could conclude from the circumstantial evidence that the firearms and ammunition were not in the cabin at the same time he was. In support, he recites the following: There was no evidence when the firearms and ammunition arrived; there were no dust rings around the documents, ammunition, or weapons; the unidentified woman made her statement to Deputy Crosswhite in August; Castillo could not remember the date that she and Valerie attempted to serve Dunn at the cabin; and there were no fingerprints on the firearms. But for the jury to reach this conclusion it would need to disregard the undisputed evidence that Dunn's wallet was on the bedroom nightstand at the same time the firearms and ammunition were in the bedroom closet. The jury would also need to disregard Castillo's testimony that she saw Dunn carrying a black or blackish rifle. It is theoretically possible that some unidentified person brought the firearms and ammunition to the closet and placed them next to Dunn's personal records for some unknown reason without telling Dunn and without Dunn's knowledge—and that Dunn then entered the room and left his wallet on the nightstand without noticing the arrival. But it is not a reasonable conclusion based on the evidence.

10

Fourth, Dunn proposes that the firearms and ammunition belonged to a prior tenant of the cabin. He does not develop this argument beyond noting that the cabin previously had a tenant who had been the caretaker of the property before Dunn. This bare fact, however, does not undermine the evidence or conclusions discussed above pointing to his control over the weapons and ammunition.

We are also unpersuaded by Dunn's argument that the court's omission of CALCRIM No. 224 negatively impacted the jury's perception of defense counsel or of Dunn's primary defense such that reversal is warranted. As Dunn recounts, in his closing argument defense counsel referred to a jury instruction covering the requirements of CALCRIM No. 224 and told the jury it would need to comply with those requirements. The court, of course, did not proceed to give the instruction. But we find speculative Dunn's contention that the omission caused the jury to doubt defense counsel generally. The prosecutor did not draw attention to the reference in her rebuttal closing argument or otherwise suggest that defense counsel was untrustworthy because of it. We find unlikely that the jury noticed or remembered the discrepancy between the defense counsel's statement and the many pages of jury instructions given by the court. Further, absent the alleged error, and thus absent any potential negative perception of counsel, we do not think the jury reasonably could have reached a different conclusion on any of the nine counts given the strength of the evidence presented.

## II.

Dunn also contends his convictions on three of the four firearm counts should be reversed because the court erred by giving the jury a unanimity

11

instruction.[3]  Such an instruction is warranted when conviction on a single count may be based on more than one act and the jurors may disagree about which particular act the defendant committed.  (*People v. Beardslee* (1991) 53 Cal.3d 68, 92–93.)  It explains to the jurors that they must unanimously agree on the specific criminal act.  (*People v. Gordon* (1985) 165 Cal.App.3d 839, 853.)

The Attorney General concedes that the court erred, and we agree.[4]  A trial court should " 'refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury. . . .' "  (*People v. Saddler* (1979) 24 Cal.3d 671, 681.)  Here, a unanimity instruction would have been appropriate had Dunn been charged with possessing multiple firearms under a single count.  Then the jurors would have needed to agree unanimously on which firearm Dunn had possessed.  Instead, the information charged Dunn with four separate counts, each relating specifically to one of the four firearms found in the bedroom closet.  There was no need to instruct the jury, as the court did, that "[y]ou may not find the defendant guilty unless all of you agree that the People have proved that the defendant possessed at least one of the firearms, and you all agree on which firearm he possessed."

---

[3] Dunn requests reversal for counts 1, 2, and 4, which relate to the black shotgun, the camo shotgun, and the sawed-off—or "break action"—shotgun.

[4] The Attorney General argues that the claim of error is forfeited because Dunn did not object in the trial court, whereas Dunn maintains his claim is nonetheless cognizable because the error affected his substantial rights.  (*People v. Campbell* (2020) 51 Cal.App.5th 463, 499.)  We need not address this issue because we conclude below that the error was harmless in any event.

Dunn contends that the error prejudiced his case as to three of the four firearm counts because the prosecutor pointed to separate evidence that Dunn possessed the AR-15 rifle in particular—namely Castillo's testimony that she had seen him with a black rifle. According to Dunn, the unanimity instruction would have allowed a juror to find him guilty on all four counts by crediting only this testimony regarding the AR-15 rifle.

We find that the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 23–24.) The separate counts for each firearm, while making the unanimity instruction inappropriate, also mitigated any confusion stemming from the error. The jury received a separate sheet of paper for each firearm count, each requiring the jury to decide guilty or not guilty as to the particular listed firearm. For example, the verdict form for Count One stated, "[w]e the jury . . . find the defendant, Morgan James Dunn [Guilty/Not Guilty] of the offense charged in Count One of the Information, to wit, possession of a firearm by a prohibited person, to wit, a black shotgun, and in violation of Penal Code section 29800(a)(1), a felony." The court instructed the jury that it "must consider each count separately and return a separate verdict for each one." And, in fact, the jury returned a separate verdict for each count.

The context of the jury instructions as a whole also mitigated the error. (See *People v. Castillo* (1997) 16 Cal.4th 1009, 1016 [" '[t]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction' "].) The court instructed that "[e]ach of the counts charged in this case is a separate crime" and that the jury "must consider each count separately and return a separate verdict for each one." It also instructed that "[p]roof beyond a reasonable doubt is proof that leaves you with an abiding

conviction that the charge is true" and that "you must decide whether a fact in issue has been proved based on all the evidence." These instructions would have left the jury with the impression that facts supporting each count had to be proved.

Reviewing the whole record—including the separate verdict forms, the mitigating instructions, and the strong evidence supporting the jury's verdicts discussed above—we conclude that the court's error in providing the unanimity instruction was harmless beyond a reasonable doubt.

## III.

Relying on *Chambers v. Mississippi* (1973) 410 U.S. 284, 302–303, Dunn argues that even if the two instructional errors were harmless, "their combined effect results in prejudice because they cumulatively resulted in a fundamentally unfair trial." We disagree. This is not a case in which the defendant was unable to present critical evidence or cross-examine an important witness. (See *Chambers v. Mississippi,* at pp. 291–295, 298–303.) For the reasons we have already discussed, we conclude that the combined effect of the errors did not rise to the level of depriving Dunn of a fundamentally fair trial.

## DISPOSITION

The judgment is affirmed.

GOLDMAN, J.

WE CONCUR:

STREETER, Acting P. J.
MOORMAN, J. *

---

*Judge of the Mendocino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

| | |
|---|---|
| Trial Court: | Humboldt County Superior Court |
| Trial Judge: | Honorable John T. Feeney |
| Counsel for Defendant and Appellant: | Patrick J. Hoynoski, under appointment by the Court of Appeal |
| Counsel for Plaintiff and Respondent: | Rob Bonta<br>Attorney General of California<br>Charles C. Ragland<br>Chief Assistant Attorney General<br>Jeffrey M. Laurence<br>Senior Assistant Attorney General<br>Eric D. Share<br>Supervising Deputy Attorney General<br>Molly A. Smolen<br>Stephanie F. Richardson<br>Deputy Attorneys General |