[No. D004416. Fourth Dist., Div. One. Aug. 12, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN JAMES CAMPBELL, Defendant and Appellant.

**COUNSEL**

Kimberly J. Grove, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Assistant Attorney General, Frederick R. Millar, Jr., and Yvonne H. Behart, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WORK, J.**—John Campbell was convicted of first degree murder (Pen. Code,[1] § 187) and mayhem (§ 203) of Patricia Pekny. He contends the trial court erred in denying his request to evaluate his competency to stand trial; there was insufficient evidence to support instructions on felony murder and murder by torture; the Penal Code and the instructions do not adequately distinguish between murder with express malice and voluntary manslaughter; the instruction regarding the order in which the jury should render verdicts on the homicide offenses was improper; and he was prejudiced when the trial court preinstructed only on the elements of first degree murder and not on the lesser homicide offenses. We affirm the judgment.

---

[1] All statutory references are to the Penal Code unless otherwise specified.

I

Campbell met Pekny in February 1984, began a romantic relationship, and moved in with her. Around the end of May or beginning of June 1985,[2] they decided not to live together. He moved out at the end of July but they maintained contact by telephone. On August 3, according to Campbell, they had a telephone conversation during which they reaffirmed their love for each other and confirmed that neither of them was romantically involved with anyone else, but decided they would live separately while still maintaining a committed relationship.

From about 9:30 a.m. on August 10 until about 2 a.m. on August 11, Campbell claims he drank about 10 beers, 5 glasses of rum and another drink. Campbell and Pekny had made arrangements that he would go to her apartment on August 11 to move his property stored in a storage shed outside the apartment. On the way home from a bar about 2 a.m. on August 11, Campbell made a spur-of-the-moment decision to go to her residence with the purpose of checking to see if she had done anything destructive to his property as she had done earlier in their relationship. He was standing in the walkway near Pekny's apartment, checking to see if any of his books or clothes had been thrown out and were lying around, when he looked through her living room window and saw a man sitting and talking with her. Campbell felt angry and dumfounded because he had thought she was not involved with anyone else, that they had made promises to each other, and were going to get married. He saw Pekny acting very affectionate toward the man, acting happy and drinking wine. He heard the man tell her his telephone number. Campbell felt angry, upset, and "pissed off," feeling that she had lied to him, since they had a very close emotional relationship. He saw the man and Pekny leave the apartment together, heard Pekny tell the man she hoped to see him tomorrow and really wanted him to meet her family, and saw Pekny kiss him. The kiss Pekny gave was a passionate kiss, not just a peck, and it angered Campbell.

Campbell claims he walked by the shed, saw that everything seemed to be in order, and then as he started walking back towards his car, decided to start moving his things out of the shed. He went back to his car and changed out of the suit he had been wearing into jeans and an old shirt. He sat down in the car, had another glass of rum, and passed out from exhaustion and from drinking. He came back to consciousness, felt disoriented, did a couple of "jumping jacks," and then took a screwdriver, a plastic trash bag, and a pair of cloth gloves from the car. He planned to use the screwdriver to get into the shed since he did not have a key to it. He was going to use

---

[2] All subsequent references to dates are to the year 1985 unless otherwise indicated.

the trash bag to move some cans and newspapers, which were next to the shed, over to the yard of a neighbor for whom he often collected such items. He was going to wear the gloves to pick up the boxes, explaining he always wore gloves when doing such manual labor.

Since Campbell had been unable to find his tennis shoes in the car and did not want the moist grass to ruin the good leather shoes he was wearing, he took off his shoes and put them on a wall. He does not know why, but he picked up a brick cinder block. He was heading towards the storage shed, planning to open it up and move things, and for some reason unknown to him he instead turned towards Pekny's apartment. He felt "pissed" and very upset, as if he was reliving the moment between Pekny and the man. He lost control, not knowing what he was going to do or why he was there. Everything was a blur, a frenzy, and then he became consciously aware that he was standing at her window. He was very, very upset and angry, and he saw blood on her window shade and knew something was wrong. He did not remember hitting her. He moved the shade a bit and saw her lying there and blood on the pillow. He "freaked out," he did not know what was going on, and he saw blood on his hands and gloves. He almost fainted, held onto the window sill, and then walked away to the end of the apartment and fell on his knees, feeling he was going to vomit. He got up, went back to the window, pushed the shade open, touched her on the forehead, and saw she was aspirating blood. He reached in and cleaned out her throat. He couldn't figure out what was going on, but became increasingly aware of his own involvement, knowing he had done something wrong, but not understanding why he had done it. He still felt angry and "pissed off," but at the same time realized his girlfriend was hurt. He heard the phone ringing, became aware of what was happening, and felt he had to do something.

He saw a neighbor's window was open halfway, called out her name and heard no response. He decided to either call the police for an ambulance, or take Pekny to the hospital himself. He started running, felt himself being tackled, thrown to the ground, and handcuffed, as he was hysterically saying not to let her die, to please help.

The arresting officers stated Campbell was walking with the bloody screwdriver and block when apprehended. He appeared calm and sober. He put the items down when ordered to do so and placed his hands behind his back when requested to do so. During handcuffing he escaped and was recaptured.

Barbara Wallace's bedroom window was less than six feet from Pekny's bedroom window. She testified she was with Pekny when a man named Eric Polansky visited Pekny on the night of August 10. Wallace left Pekny's

apartment about 1:30 a.m. and she heard Polansky leave Pekny's apartment about one-half hour later. She woke up around 3:30 a.m. and heard grunting and heavy breathing noises outside her window. She looked out her window and saw Campbell standing at Pekny's window. She no longer heard the grunting or breathing noises, and saw Campbell turn and walk away. She saw a dark liquid on the window shade and she took her phone into the bathroom and called the police. She went back to her bedroom, looked out the window and saw Campbell with his arms inside Pekny's window, with his right arm moving in an up and down movement, heard the grunting noise again, and heard a gushing-type sound that coincided with the down movement of his arm. She went back to the bathroom and called the police again.

Polansky testified he had just met Pekny that night, he did not recite his phone number to her, and he did not engage in a passionate kiss with her, but at most might have given her a peck on the cheek as was his custom.

The police found a pry mark by the pin used to secure the screen on Pekny's bedroom window and found the window screen off the window and placed nearby.

Pekny suffered numerous cuts on the scalp, multiple lacerations and fractures of the face, and multiple fractures of both sides of the skull. The emergency room physician opined she had sustained between five and twenty forceful blows to the face and skull.

On her left cheek and jaw area in front of the ear were about 25 small punctures in the skin, each about a quarter of an inch in length. These lacerations did not appear to be deep, had the mark of a tool, and could have been made with a screwdriver minimally penetrating the skin. It is likely the wounds were made with small, short thrusts. These wounds would not likely have been sufficient to cause death by themselves, although they could have caused a considerable amount of pain if the brain was registering pain.

On the right side of the victim's face and head were bruises and breaks in the skin, numerous fractures, bruising and swelling of the brain, and hemorrhaging and blood clotting in the brain. The right ear was extensively torn and its pieces put together by a surgeon. The injuries were likely made with a rough object which had a flat dimension of about four to six inches, was relatively heavy, and which struck chiefly on the right side of the head and face with a heavy blow. One master blow could have caused most of the injuries to the right side of the face, but there were indications of more than

one blow from the bruises on the left side of the forehead and from extensive tears on the right ear.

It is likely that once the victim's skull was fractured and her brain bruised, she was rendered unconscious. There was no way of knowing whether she first sustained the breaks in the skin on the left side of the face or the blows to the right side of the head.

## II

### APPOINTMENT OF EXPERT TO EVALUATE COMPETENCY TO STAND TRIAL

Campbell argues the trial court abused its discretion in not appointing an expert to evaluate his competency to stand trial.

On the eighth day of trial, defense counsel requested a psychological examination under section 1368 based on his opinion Campbell was unable to understand and appreciate the nature of the proceedings. Defense counsel stated he believed Campbell understood the proceedings when the trial started, but since then had become "unglued" and "unraveled." Defense counsel characterized Campbell's direct examination the previous day as "babbling."

Defense counsel explained that when he compared the conversations he had with Campbell when preparing him for trial with Campbell's testimony in court, he concluded Campbell was becoming unglued and was not assisting counsel in presenting a defense in a rational manner.

Defense counsel requested an expedited report on Campbell's mental status, and that certain letters Campbell had filed with the court and a transcript of Campbell's testimony during the previous day be made available to an examining psychologist. Defense counsel stated the jury need not be discharged as provided for in section 1368, subdivision (c), and the matter could be resolved in one or two days.

The trial court denied the request on the basis it only had to proceed under section 1368 if the court had a doubt Campbell was competent to stand trial and it had no such doubt.

When a defendant presents substantial evidence of mental incompetence which makes him unable to understand the nature of the proceedings against him or to assist in his defense, he is entitled to a hearing as a matter of right under section 1368 to determine the issue of competency, even if the

trial judge does not subjectively have a doubt as to competency. (*People* v. *Pennington* (1967) 66 Cal.2d 508, 518 [58 Cal.Rptr. 374, 426 P.2d 942]; *People* v. *Deere* (1985) 41 Cal.3d 353, 358 [222 Cal.Rptr. 13, 710 P.2d 925].)

A mental health expert's opinion that a defendant is incapable of understanding the proceedings or assisting in his defense is alone substantial evidence of incompetency mandating a hearing. (*People* v. *Pennington, supra,* 66 Cal.2d at p. 518.)

■ Campbell concedes defense counsel's mere statement to the court regarding Campbell's possible incompetency may not have been substantial evidence warranting a section 1368 hearing. (*People* v. *Claxton* (1982) 129 Cal.App.3d 638, 667 [181 Cal.Rptr. 281].) However, he asserts his lawyer's concerns about competency were sufficient to at least warrant appointment of an expert for an evaluation, without which he was deprived of the opportunity to obtain the evidence necessary to trigger his right to a hearing.[3]

Section 1368 states the competency hearing shall be held pursuant to section 1369. Section 1369 states: "A trial by court or jury of the question of mental incompetence shall proceed in the following order:

"(a) The court shall appoint a psychiatrist or licensed psychologist, and any other expert the court may deem appropriate, to examine the defendant . . . ." ■ Since section 1369 provides for a psychiatric examination at the commencement of a section 1368 competency hearing, it follows the trial court is not mandated to order an expert evaluation *under that statutory scheme* unless it has been presented with substantial evidence of incompetency.

■ Nevertheless, Evidence Code section 730 authorizes the trial court to appoint an expert whenever required by a party. ■ Moreover, based on the constitutional right to a fair trial, a trial court *must* appoint an expert for an indigent defendant if the defendant shows the expert's services are reasonably necessary to his defense. (*People* v. *Worthy* (1980) 109 Cal.App.3d 514, 520-521 [167 Cal.Rptr. 402], and cases there cited.) In-

---

[3] The People point out that apparently Campbell was examined before trial by mental health professionals and the defense did not enter a not guilty by reason of insanity plea. These facts do not dispose of Campbell's contention since there is no indication Campbell was evaluated for his competence to stand trial, and the issues involved in an insanity defense are not the same as those involved in a competency to stand trial evaluation. (See *People* v. *Corona* (1978) 80 Cal.App.3d 684, 713 [145 Cal.Rptr. 894].) Moreover, even if the mental health evaluation addressed the competency issue *before* trial, the basis of the defense request for a psychiatric examination arose from counsel's belief Campbell had become incompetent *after* the trial had begun. (See *People* v. *Sundberg* (1981) 124 Cal.App.3d 944, 957 [177 Cal.Rptr. 734].)

deed, trial courts frequently order psychiatric examinations *before* deciding whether or not a full-scale section 1368 competency hearing is warranted. (See, e.g., *People* v. *Stankewitz* (1982) 32 Cal.3d 80, 88 [184 Cal.Rptr. 611, 648 P.2d 578, 23 A.L.R.4th 476]; *People* v. *Hays* (1976) 54 Cal.App.3d 755, 757 [126 Cal.Rptr. 770]; *People* v. *Schneider* (1979) 95 Cal.App.3d 671, 678 [157 Cal.Rptr. 314]; *People* v. *Ashley* (1963) 59 Cal.2d 339, 363 [29 Cal.Rptr. 16, 379 P.2d 496]; cf. *People* v. *Deere, supra,* 41 Cal.3d at p. 358.) When a judge's attention is called to the issue of incompetency, he has the duty to determine whether there is substantial evidence to require a full section 1368 hearing. (*People* v. *Sundberg, supra,* 124 Cal.App.3d at p. 955.) ▉ Therefore, we hold if there is a reasonable possibility, even if it does not rise to the level of substantial evidence, that the defendant is unable to understand the proceedings or assist in his defense, the trial court must order a psychiatric examination before deciding there is no need for a section 1368 hearing.[4]

During the direct examination testimony which defense counsel characterized as "babbling," Campbell testified at length about his state of mind. Illustrative of his testimony are the following excerpts: ". . . About that point—I've tried to figure it out. I've had months to figure it out, and I've talked to people about it and they've helped me get all those kinds of things out and I've relived it through experiences and dreams and things like that —but I turned, I knew I was heading toward the storage shed. I was going to open up the storage shed and move things. I don't know why I had the brick in my hand. I'm heading toward the storage shed, and I turned for some reason toward Patty.

"Q. Why did you turn—what do you remember after you turned toward Patty?

"A. I was pissed. I was very upset.

"Q. Why?

"A. If I knew more about the brain and how it worked, I probably wouldn't be here. I don't know why. I turned, I think it's just that I was like reliving that experience, that moment with her and Eric.

"I now know it's Mr. Eric Polansky. I was like reliving that moment. I was really upset. I just lost it. I lost control, sensibilities. I didn't even know what I was going to do, and why I was there.

---

[4]Our holding assumes, of course, the defense has not on its own obtained a psychiatric report and presented it to the court.

"... . . . . . . . . . . . . . . . . . . . .

"Q. What next do you remember?

"A. God, it's such a blur. It was like frenzy. One of the things that really comes to my mind, I didn't realize that probably until a week or so later, was I became consciously aware of the fact that I was standing at my girl friend's window. I was very very upset. I was very angry, and I saw her window shade, our window shade and something was wrong.

"I'm having difficulty explaining. I remember when I was a child, my grandfather—

"... . . . . . . . . . . . . . . . . . . . .

"Q. Go ahead, tell us about that.

"A. I remember several experiences in my background that kind of triggered to me something was wrong, danger, emotion. What I saw after I really became aware of what was going on was, I saw blood on her curtain on the pull-down curtain. I honestly don't remember, don't remember hitting her or any of this.

"What I saw, what I saw was some blood on the shade, and it just triggered a memory. I remember my grandfather shot a moose. I remember up in the Lagunas. Somebody hit a deer, and there was blood in the snow. And it was wrong, something was wrong.

"... . . . . . . . . . . . . . . . . . . . .

"Q. Then what happened?

". . . I kind of jumped back, stood there. I couldn't figure out what was going on. I became increasing aware of my own involvement in this whole thing. I had done something wrong. I didn't understand why I had done something wrong. I didn't know quite what was going on.

"I was still angry, still pissed off, but at the same time here is my girl friend, she's hurt. She's really hurt. I just stood there. I just froze at the window. The phone rang. It just blew my mind. The phone started ringing. Her phone started ringing in the living room, and I could hear her. The first set it rang, it actually rang two sets. It was just like three rings, and I could feel it as the phone was ringing, my mind was racing faster. I was really aware of where I was, what was going on, what was happening.

". . . . . . . . . . . . . . . .

"Q. What happened then?

"A. . . . I'm just running. I hit something. I'm spun around. Boom. Flat down on the ground. I'm right on my face. I didn't know what was going on. I didn't think. Hindsight, but at the time I didn't know what was happening. I didn't know what I hit. I'm running, I remember throwing things down like that. I'm running, my head is tucked like this. I'm turning around. I'm taking a big step like that, and as I'm, turning my head, I saw something out of my right eye. It could have been both eyes, but it seemed right out of my right eye, and I saw a person.

"It didn't make sense, because it just didn't fit for in that area, but I knew it was a person, and I saw something like black cutting across then. I'm still running. My head is turning. Smack I ran into something. I'm being flipped around and slammed down to the ground, and somebody is just like boom boom boom, hitting me in the back, smashing the right side of—I've got my glasses on, smashing the right side of my face. I can feel gravel. . . . .

"I was being ground in gravel. I'm hysterical. I'm crying. "Please don't hurt me. Help my girl friend. She's dying. Who are you? What's going on?" All kinds of things. Things happened so fast, I heard someone say things to me that kind of come back to me real fast, are still embedded in my memory.

"Q. Like what?

"A. My face is being ground, right side of my face is being ground into the concrete, and I can feel the gravel, and it felt like my glasses were decomposing or breaking under me, and this person who I honestly did not know, I didn't even know until today, the first thing this person says was he's got blood on his glasses, and then he kept on moving me around. I could feel him twisting my arm, like a kind of half nelson.

"I kept saying, "Please don't hurt me. My girl friend—God." It's not my blood. I don't understand? What do you want? I'm still—there's still this person is still twisting me around, grinding my face, and I can feel the arm going back up, and then something is hitting me in the back, and I can feel the other arm go up, and about the time the other arm goes up, I can hear— it was a man's voice, and it was pretty gruff. And this person said, "Why are you resisting?" And I stopped moving. I may not have been in full control of my senses, but I had the impression that this person, whoever it was, who was, I felt, accosting me, wasn't trying to rob me or trying to mug me.

There are people who are walking down that alley, all weird types. There has been crime in that alley.

"......................

"Q. Do you recall now anything more other than what you've told us about this? These events of the 10th and 11th of August, 1985?

"A. I was really mad. Probably when I saw her with that other guy, maybe that's no reason. I accept the responsibility for what's happened. I hope the jury may be able to figure this out or accept what's happened. I just hope there is some justice in it, but I was really upset. If there is such a thing as a man can really become upset when his girl friend or wife, whatever, is unfaithful, too much to drink. It's not necessarily—I'm not asking to be released of my responsibilities. I remember one of the jurors during voir dire said, but that night it was just so crazy. I could have gotten her to the hospital. I knew the exact distance. I've been to Mission Bay before.

"I woke up in the back of the police car. It was somewhere around 6:00 or 6:30. I was handcuffed, and my right arm was numb. I couldn't move it at all.

"I heard a helicopter. That's what woke me up, and I tried to remember. Things were starting to come back to me. Eric's phone number came back to me inmediately, the numbers stick with me really close. I was just really—I lost it. I lost control. I am very upset with myself. I've ruined my life."

 Although Campbell's testimony is in a "stream of consciousness" style, it is coherent and not "babbling." It appears counsel made a tactical choice to allow Campbell to reveal his emotions and thought processes to the jury in the hope it would find Campbell did not have the requisite state of mind for a murder, as opposed to a manslaughter, conviction.[5] Defense counsel allowed Campbell to continue his narrative answers without interruption. Counsel's open-ended questions such as "What next do you remember?" and "Then what happened?" encouraged Campbell to continue in narrative style and do not suggest counsel felt he had lost control of a witness who was becoming "unglued."

Regarding defense counsel's reference to a letter Campbell had submitted to the court, Campbell read a letter into the record which stated due to the fact he was not sleeping or eating enough, and thus was not fully alert

---

[5] For example, as Campbell was finishing his testimony, defense counsel asked the following question, to which an objection was sustained: "Is there anything else that you would like the jury to know in helping them make a decision on this case?"

during the court proceedings, he discovered he made a mistake in his testimony the previous day. That is, he had testified he had not seen Pekny since July 19 or 20, whereas he now remembered he did see her twice after those dates. Campbell explained he did not want to mislead the court, jury, or prosecutor, but he was simply mentally and physically exhausted. The court responded that Campbell could tell the jury of his mistake during cross- or redirect-examination that day.

The letter reflects a concern that the jury be presented with all the facts pertinent to Campbell's state of mind at the time he committed the homicide.[6] The letter does not suggest any lack of understanding as to the nature of the criminal proceedings.

We cannot glean any suggestion of incompetency from the record, and we conclude the trial court did not abuse its discretion in failing to order a psychological evaluation.

Campbell contends the trial court did not appear to be aware of its discretion to appoint an expert without suspending the criminal proceedings, nor aware of the rule that it must order a section 1368 hearing if substantial evidence of incompetency was presented, regardless of its own lack of doubt. Neither the trial court nor defense counsel discussed the possibility of ordering a psychological evaluation to determine if there was substantial evidence of incompetency triggering a mandatory hearing.[7] However, there is nothing in the record which suggests the trial court believed it did *not* have the discretion to appoint an expert before deciding whether a hearing was necessary, nor that it believed it did *not* have to order a hearing even if presented with substantial evidence of incompetency. We presume the trial court was aware of and performed its duty (*People* v. *Cowan* (1940) 38 Cal.App.2d 144, 151 [100 P.2d 1079]; cf. *People* v. *Wilburn* (1958) 49 Cal.2d 714, 719 [321 P.2d 452]; Evid. Code, § 664), and would have ordered a psychological examination had there been *any* suggestion of incompetency and thereafter ordered a hearing if presented with substantial evidence of incompetency.

---

[6] On cross-examination, Campbell stated he saw Pekny on August 8 (three days before she was killed), and admitted they had agreed at that time not to go within one hundred yards of each other's houses. Campbell's assertion to the court that he had seen Pekny a second time after July 20 was not brought out on cross- or redirect-examination.

[7] Defense counsel did not refer to the possibility of appointing an expert as a preliminary step to determine if a section 1368 hearing was warranted, but instead framed his request in terms of suspending the proceedings for one or two days under section 1368. We deem the issue not waived since as discussed above, once the trial court was alerted of the possibility of incompetency, it had the duty to determine if there was substantial evidence warranting a hearing.

## III

### INSTRUCTIONS ON FIRST DEGREE MURDER BY MAYHEM OR TORTURE

The jury was instructed it could find guilt of first degree murder on any one of three theories: murder by premeditation and deliberation, felony murder with the underlying felony as mayhem, or murder by torture. Campbell argues there was insufficient evidence to support the latter two theories.

### FELONY-MURDER/MAYHEM

 Under the felony-murder doctrine, Campbell must have had the *specific* intent to commit mayhem, even though mayhem is otherwise a general intent crime. (*People v. Jentry* (1977) 69 Cal.App.3d 615, 628 [138 Cal.Rptr. 250].) Mayhem is committed when a person deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, puts out an eye, or slits the nose, ear or lip. (§ 203.) (7) There is insufficient evidence of specific intent to maim if a defendant merely indiscriminately attacks his victim. (*People v. Sears* (1965) 62 Cal.2d 737, 745 [44 Cal.Rptr. 330, 401 P.2d 938]; *People v. Anderson* (1965) 63 Cal.2d 351, 359 [46 Cal.Rptr. 763, 406 P.2d 43].)

 Here, the information charged, the jury was instructed, and the People argued that the alleged mayhem occurred by the tearing off of Pekny's ear. The issue is whether Campbell specifically intended to tear off Pekny's ear, or whether he merely intended to generally attack Pekny. To apply the felony-murder doctrine, the jury cannot infer the intent to maim merely because the ear was in fact partially severed. Rather, there must be other facts and circumstances which support an inference of intent to tear off the ear rather than to only indiscriminately attack. (*People v. Sears, supra,* 62 Cal.2d at p. 745; see generally *People v. Tolbert* (1969) 70 Cal.2d 790, 801 [76 Cal.Rptr. 445, 452 P.2d 661].)

Pekny sustained 25 superficial breaks in the skin of her cheek in front of her left ear, likely from the use of the screwdriver. Most of the serious injuries were on the right side of the face, including the torn ear, likely from the use of the brick. The attack was focused on Pekny's face and head. The facts indicate Campbell limited the amount of force he used with the screwdriver rather than stabbing with his full force, and limited the scope of the attack with the brick to the head and face, rather than randomly attacking Pekny's body. The controlled and directed nature of the attack supports an

inference Campbell intended to disfigure Pekny's face, including her right ear.[8] There was sufficient evidence to support the felony-murder instruction.

The facts of *People* v. *Anderson, supra,* 63 Cal.2d at pages 355-356, 359, and *People* v. *Sears, supra,* 62 Cal.2d at pages 741, 745, are distinguishable. In *Anderson,* the victim sustained over 60 wounds over the entire body. In *Sears* the victim suffered a fractured jaw and arm, and there were no facts suggesting the defendant limited the amount of force during any part of the attack.

## MURDER BY TORTURE

■ Murder by torture requires that the acts which caused the death involve a high degree of probability of death, and the defendant intend to cause pain for the purpose of revenge, extortion, persuasion, or any other sadistic purpose. (*People* v. *Wiley* (1976) 18 Cal.3d 162, 168 [133 Cal.Rptr. 135, 554 P.2d 881].) The killer is not satisfied with killing alone, but wishes to cause pain and suffering. (*People* v. *Davenport* (1985) 41 Cal.3d 247, 267 [221 Cal.Rptr. 794, 710 P.2d 861].) The killer wishes to punish, to execute vengeance on, or extort something from the victim, and in the course of, or as a result of, inflicting pain and suffering, the victim dies. (*Ibid.*) Murder by torture is categorized as first degree murder because of the calculated nature of the acts causing death. (*Ibid.*) It is not necessary the victim actually be aware of pain, but there must be a causal relationship between the torturous act and the victim's death. (*Id.* at pp. 267-268.) The nature of the victim's wounds is not determinative of the issue of intent to torture; rather, there must be other evidence of intent to cause suffering. (*Id.* at p. 268; *People* v. *Wiley, supra,* 18 Cal.3d at p. 168.) However, the condition of the body is a circumstance to be considered along with other circumstances in determining the sufficiency of the evidence to support an instruction on murder by torture. (*People* v. *Steger* (1976) 16 Cal.3d 539, 546 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206]; *People* v. *Soltero* (1978) 81 Cal.App.3d 423, 429 [146 Cal.Rptr. 457]; disapproved on another point in *People* v. *Williams* (1981) 29 Cal.3d 392, 409 [174 Cal.Rptr. 317, 628 P.2d 869].) Our Supreme Court has reversed convictions based on a torture-murder theory in spite of the gruesome condition of the victim's body when the evidence showed the killing resulted from an explosion of violence rather than from a cold-blooded intent to inflict pain. (See *People* v. *Davenport, supra,* 41 Cal.3d at p. 268, citing *People* v. *Tubby* (1949) 34 Cal.2d 72, 77-78 [207 P.2d 51] and *People* v. *Anderson, supra,* 63 Cal.2d at p. 360; *People* v. *Steger, supra,* 16 Cal.3d at p. 548.)

---

[8] Disfigurement of the face is alone sufficient to constitute mayhem. (*People* v. *Newble* (1981) 120 Cal.App.3d 444, 448-450 [174 Cal.Rptr. 637].)

■ The evidence here is sufficient to support an inference Campbell intended to cause Pekny pain and did not merely explode into violence. During direct examination, Campbell insisted he and Pekny had reaffirmed their love and commitment, and yet he stated he went to her residence the night of August 10 to see if she had done anything destructive to his property. On cross-examination, he admitted they had agreed on August 8 not to come within 100 yards of each other's residences. From these facts the jury could infer he arrived at Pekny's residence in a bitter state of mind because of the termination of a relationship he refused to admit had ended. After arriving at Pekny's residence, Campbell became extremely angry from seeing Pekny with another man and he felt Pekny had broken a promise of commitment. He did not immediately attack Pekny after observing her with Polansky, but went to his car, drank, and slept before gathering the tools he used to inflict the injury. He surreptitiously approached Pekny through her bedroom window and apparently pried off the window screen. From this passage of time and intervention of events, it could be inferred he did not simply explode into violence from jealousy, but rather made a calculated decision to make Pekny suffer for her perceived disloyalty. Pekny's neighbor first observed Campbell standing motionless at Pekny's window with blood on the window shade. She saw him leave the window area and a short while later saw him again at the window, moving his arms up and down in a thrusting motion and she heard a gushing-type sound when he thrust his arm down. These facts can support an inference that first Campbell inflicted the superficial wounds with the screwdriver and perhaps some blows with the brick, left Pekny for a few moments to suffer in pain, and then returned to administer the heavy blows with the brick. In short, the total circumstances can support an inference that Campbell, already embittered about the breakup of the relationship, became enraged at the sight of Pekny with another man and decided to punish her by making her suffer pain.

Campbell argues the screwdriver wounds were not severe enough to alone cause death, and the brick attack does not indicate an intent to torture since it could have rendered Pekny unconscious. Since the circumstances support an inference that the overall attack, not merely the screwdriver attack, was designed to cause pain, it is not necessary that the screwdriver wounds themselves be the cause of death. The fact that Pekny may have been rendered unconscious from the brick attack does not provide Campbell with a fortuitous defense if he had the intent to cause pain. (*People* v. *Wiley, supra,* 18 Cal.3d at p. 173.) Even if Campbell first attacked Pekny with the brick and rendered her unconscious, the jury could infer his departure and return for a subsequent screwdriver attack supports an inference he wanted her to languish in pain before he completed the assault.

We hold there was sufficient evidence to support a murder-by-torture instruction.[9]

## IV

### THE DISTINCTION BETWEEN MURDER AND VOLUNTARY MANSLAUGHTER

A. Campbell contends the jury instructions did not define malice sufficiently to distinguish between murder based on express malice and voluntary manslaughter, both crimes which require an intent to kill. We assume, arguendo, Campbell did not waive his contention by failing to object below. (See *People* v. *Romo* (1975) 47 Cal.App.3d 976, 990 [121 Cal.Rptr. 684], disapproved on another point in *People* v. *Bolton* (1979) 23 Cal.3d 208, 213-214 [152 Cal.Rptr. 141, 589 P.2d 396].)

Regarding the crime of murder based on express malice, the jury was told, "*murder* is the unlawful killing of a human being *with malice afore-thought*; "*malice* is *express* when there is manifested an *intention unlawfully to kill a human being*"; and "when it is shown that a killing resulted from the intentional doing of an act with either express or implied malice, *no other mental state need be shown* to establish the mental state of malice aforethought." (Italics added; see CALJIC Nos. 8.10, 8.11.)

Regarding the crime of voluntary manslaughter, the jury was told, *voluntary manslaughter* is the unlawful killing of a human being *without malice aforethought when there is an intent to kill*. There is no malice aforethought if the killing occurred upon a sudden quarrel or *heat of passion*." (Italics added; see CALJIC No. 8.40.)

The court summarized the distinction between murder and manslaughter as follows: " . . . by way of review—the distinction between murder . . . and manslaughter, is that murder . . . requires malice while manslaughter does not.

"When the act causing the death, although unlawful, is done in the heat of passion or is excited by a sudden quarrel such as amounts to adequate provocation . . . the offense is manslaughter.

"In such a case, even if an intent to kill exists, which would be voluntary manslaughter, the law is that malice, which is an essential element of mur-

---

[9] We note although there was evidence Campbell had been drinking, Campbell does not argue nor does the evidence suggest he was so intoxicated that as a matter of law he could not form the requisite intent to commit mayhem or torture.

der,[10] to establish that a killing is murder, other than felony murder, not manslaughter, *burden is on the People to prove beyond a reasonable doubt each of the elements of murder and that the act which caused the death was not done in the heat of passion or of a sudden quarrel.*

"If you're satisfied beyond a reasonable doubt that the killing of Patricia Pekny was unlawful but you have a reasonable doubt whether the unlawful killing was murder or manslaughter, *you must of course give Mr. Campbell the benefit of the doubt and find it to be manslaughter,* either voluntary or involuntary rather than murder." (Italics added; see CALJIC Nos. 8.50, 8.72.)

Read alone, the definition of express malice in CALJIC No. 8.11 is incomplete and potentially misleading. It is confusing to define voluntary manslaughter as killing without malice and with the intent to kill (CALJIC No. 8.40) when the malice element of murder is defined only as the intent to kill (CALJIC No. 8.11).

However, the trial court was cognizant of the potential for confusion and included additional instructions stressing there would be no malice where an intentional killing resulted from a sudden quarrel or heat of passion.

Thus, in light of all the instructions, we are satisfied the giving of an unmodified CALJIC No. 8.11, if error, is harmless beyond a reasonable doubt. (See *Rose* v. *Clark* (1986) 478 U.S. 570 [92 L.Ed.2d 460, 467-475, 106 S.Ct. 3101, 3103-3109]; *People* v. *Romo, supra,* 47 Cal.App.3d at p. 990.)

■■■ B. Campbell meritlessly asserts the legislative modification of the definition of malice, which eliminated the judicially developed requirement that the defendant be aware of the obligation to act within society's laws and act despite such awareness, has obliterated the distinction between murder based on express malice and voluntary manslaughter. (See 47 West's Ann. Pen. Code, § 188 (1987 pocket supp.) p. 165.) The legislative change in the definition of malice merely narrows the definition of malice and thereby removes one base upon which a defendant formerly could establish a diminished capacity defense to reduce murder to manslaughter. (See *People* v. *Conley* (1966) 64 Cal.2d 310, 322 [49 Cal.Rptr. 815, 411 P.2d 911]; *People* v. *Poddar* (1974) 10 Cal.3d 750, 758 [111 Cal.Rptr. 910, 518 P.2d 342]; and, *People* v. *Croy* (1985) 41 Cal.3d 1, 18-19 [221 Cal.Rptr. 592, 710 P.2d 392], for general descriptions of the former defense based on lack of awareness of the duty to conform to society's laws.)

---

[10] The trial court's oral instructions left out the word "absent" which is in the written instructions, which state: "In such a case, even if an intent to kill exists, the law is that malice, which is an essential element of murder, *is absent.*" (Italics added.)

C. Over defense objection, the trial court instructed the jury on the order in which it should render verdicts on the homicide offense charged in count one. The jury was essentially instructed as follows: It should first determine whether Campbell was guilty or not guilty of first degree murder; if it finds him guilty, nothing further is required for the homicide charge. If it finds him not guilty, then proceed to each of the lesser related offenses in turn only after rendering a not guilty finding on the preceding greater offense. (See CALJIC No. 8.75.)

The instruction is designed to allow the jury to render a verdict of acquittal on a greater offense even if it is deadlocked on a lesser offense, and at retrial a defendant cannot be retried on the greater offense in accordance with double jeopardy principles. (See *Stone* v. *Superior Court* (1982) 31 Cal.3d 503, 517-520 [183 Cal.Rptr. 647, 646 P.2d 809].)

Campbell argues the instruction could have caused the jury to render a guilty verdict on first degree murder based on an intent to kill and express malice finding, without ever considering whether malice was negated by heat of passion which would require a voluntary manslaughter verdict. Conceptually accurate, this argument fails because the trial court emphasized the distinction between murder and manslaughter and told the jury if heat of passion existed, the offense was manslaughter even if an intent to kill existed, and murder required proof that the killing was not done in the heat of passion. The jury was also told to consider the instructions as a whole. Although CALJIC No. 8.75 tells the jury to first reach a verdict on first degree murder, it does not suggest the jury should isolate any part of the instructions when deciding that charge. We presume the jury considered all the instructions pertaining to murder. (*People* v. *Romo, supra,* 47 Cal.App.3d at p. 990.) Thus, when it was deliberating on the charge of first degree murder, it had before it the instruction that heat of passion negates the element of malice necessary for murder.

## V

### PREINSTRUCTIONS

Campbell argues the trial court unfairly instructed the jury on the prosecution's theory of the case before the evidence was presented, without also instructing on the defense theory of the case.

The trial court told the jury in its preinstructions that the term "homicide" includes the crimes of murder and voluntary or involuntary manslaughter, as well as excusable killings such as self-defense, and the People were contending and had to prove beyond a reasonable doubt that Campbell committed first degree murder. The trial court stated it would outline

the elements of first degree murder, which was the charge against Campbell and which must be proved beyond a reasonable doubt, but that it was appropriate to wait until the evidence had been presented before possibly including instructions on the other homicide definitions such as second degree murder, manslaughter, or self-defense. The court told the jury it may be helpful to have an idea what the People had to prove to succeed in their contention of first degree murder, and the court proceeded to define the various theories of first degree murder. Included in the definitions were the statements that a mere unconsidered and rash impulse did not constitute first degree murder, and that evidence of voluntary intoxication was admissible as it related to the issue of the required specific intent for first degree murder.

The trial court's first degree murder preinstructions were framed in terms of what the prosecution had to prove, and did not suggest the trial court believed the evidence would show first degree murder. Moreover, they emphasized the specific intent required for first degree murder, which could be negated by evidence indicating a rash impulse or voluntary intoxication. Thus, although the jury was not informed of the precise definitions of the lesser homicide offenses, it was alerted to their existence. Although it would be prudent for a trial court to instruct on the lesser offenses when it chooses to preinstruct on the greater offense charged by the People (see *People* v. *Jones* (1960) 184 Cal.App.2d 464, 473 [7 Cal.Rptr. 424]), we hold the preinstructions here were not unfairly slanted in favor of the People and there was no abuse of discretion.[11]

Judgment affirmed.

Wiener, Acting P. J., and Butler, J., concurred.

---

[11] When defense counsel objected to the preinstructions only defining first degree murder, the trial court told defense counsel it would tell the jury the court was not indicating in any way that it thought the killing was first degree murder, but it was simply instructing on what the People were going to attempt to prove. The trial court did not carry out its promise, although it did generally tell the jury that the giving of an instruction which depends on the existence of a fact is not intended to suggest the existence of those facts in the evidence. Nevertheless, we find no abuse of discretion since the preinstructions were clearly couched in terms of what the People had to prove.