Filed 5/3/13  P. v. Gambino CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E053693 |
| v. | (Super.Ct.No. INF067141) |
| MANUEL ISRAEL GAMBINO, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Michele D. Levine, Judge.  Affirmed.

Catherine White, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Heidi T. Salerno, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant, Manuel Gambino, of torture (Pen. Code, § 206),[1] inflicting corporal injury on a spouse (§ 273.5, subd. (a)), during which he inflicted serious bodily injury involving domestic violence (§ 12022.7, subd. (e)), false imprisonment by violence (§ 236) and violation of a protective order (§ 273.6, subd. (b)). He was sentenced to prison for seven years to life. He appeals claiming his rights were violated by the presence, on the witness stand, of a support person with the victim, that there was insufficient evidence of the intent necessary for torture and that evidence of prior acts of domestic violence should not have been admitted and the jury instruction on those acts was flawed. We reject his contentions and affirm.

## FACTS

The victim married defendant on December 30, 1994 and, thereafter, they had three children. She had an affair the following year, which defendant constantly brought up between 1995 and 2000. They separated in 1998, but continued to see each other. They divorced in May 2000. However, they continued to live together for a period in Cathedral City. The victim had a second affair in 2007, which defendant discovered through the victim's co-workers' emails. They remarried in November 2007. The victim testified that defendant forced her to remarry him, threatening to kill her if she did not. Defendant also had affairs during the marriages, and when he and the victim were not married and not cohabitating, he would come over to her home while living with other lovers. They separated in March 2009, and, thereafter, she did not see defendant

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

romantically. She moved herself and her children into an apartment, where the crimes eventually occurred. She applied for a domestic violence restraining order and filed for divorce in April 2009. A restraining order was granted the following month. Her divorce was final two months after the crimes, which will be described elsewhere in this opinion. Some of the other acts of domestic violence perpetrated by defendant on the victim during their years together will be described elsewhere in this opinion.

## ISSUES AND DISCUSSION

1. *Presence of Support Person in Witness Box*

A week before the evidentiary portion of the trial began, the trial court informed defendant that the victim had requested to have a support person sitting next to her while she testified. The court informed defendant that it had asked counsel to supply it with the Penal Code section that allows domestic violence victims to have support persons present at trial.

A day later, the victim took the stand and there was an unrecorded side bar conference. Back on the record, the trial court introduced the jury to an employee of victims' services at the District Attorney's Office. The court explained to the jury that the presence of this support person on the witness stand was allowed by law, but the jury was "not to use that in any way, shape or form in deciding this case whatsoever, but understand that it is permitted by law, and the [c]ourt will permit it for that reason." The court then ordered the support person, in the presence of the jury, "not to otherwise make any statement or answer any questions or otherwise counsel any answers or participate in the testimony, but . . . to . . . sit quietly and be a support person on the witness stand . . . ."

3

After the victim had testified for some time[2] and while proceedings were in recess, the court noted that it "had been previously advised of [the victim's wish to have a support person on the witness stand with the victim and] . . . had indicated [it] would allow it, but [defense counsel] did advise that she was going to be placing an objection to that on the record . . . ." Defense counsel said she was objecting "to the fact that the [support person] . . . is sitting behind [the victim] . . . in front of the jury." The prosecutor pointed out that section 868.5 allows this in cases where a violation of section 273.5 is charged, as here. She added that both she and the court had instructed the victim that the support person was not there for the victim to get answers from or with whom to talk. The court noted for the record that during the victim's testimony up to that point, she was very emotional, that she paused often between questions and answers, and that she cried. The court concluded that it "sees [having a support person on the witness stand] as necessary in order [for the victim] to get through the testimony . . . . It's allowable by code. The jurors have been instructed that they are not to use that . . . . [¶] The [support person] has likewise been directed not to provide any signals to the [victim], nor any answers, nor to speak to the [victim] during her testimony. [¶] [The support person] has literally sat quietly behind the [victim], not even pouring water for [the victim] as she testifies. . . . She is otherwise attentive, but is not doing anything that the [c]ourt believes is going to influence the jury in any way, shape or form or have [the jurors] go contrary to the [c]ourt's order. [¶] In addition, the [victim] has not turned around to look at the support

---

[2]  Her testimony covered 14 pages of transcript.

person to get any type of answer or nod of approval for any [answer], and . . . the [c]ourt does not feel it's influencing [the victim's] testimony, but rather is . . . providing some necessary support so that [the victim] is able to complete her testimony." The court denied defense counsel's motion to not allow the support person to be on the witness stand with the victim.

Section 868.5 provides in pertinent part, "[A] prosecuting witness in a case involving a violation of Section . . . 273.5 . . . shall be entitled, for support, to the attendance of up to two persons of his or her own choosing, . . . at the trial . . . during the testimony of the prosecuting witness. Only one of those support persons may accompany the witness to the witness stand."

Defendant here contends that section 868.5, which allows the presence of a support person on the witness stand with the victim without a showing of necessity, violates the Sixth Amendment right to confrontation and his due process right to the presumption of innocence. However, defendant's failure to object on either of these bases below forecloses his claims. (*People v. Riccardi* (2012) 54 Cal.4th 758, 801 and cases cited therein; *People v. Romero* (2008) 44 Cal.4th 386, 411; *People v. Partida* (2005) 37 Cal.4th 428, 434.)

Moreover, this court has already rejected the contention that the presence of a support person violates a defendant's right to confrontation in *People v. Johns* (1997) 56 Cal.App.4th 550, 553-556 (*Johns*) [Fourth Dist., Div. Two][3] and we are not persuaded by

---

[3] Defendant does not even cite our opinion in *Johns* in his opening brief.

defendant's argument to depart from the position taken there.  Additionally, "[c]ase law uniformly rejects argument that section 868.5 is inherently prejudicial, erodes the presumption of innocence, and impermissibly encroaches on confrontation clause and due process clause rights.  (See, e.g., *Johns*; *People v. Adams* (1993) 19 Cal.App.4th 412, 435-444 . . . ; *People v. Patten* (1992) 9 Cal.App.4th 1718, 1725-1733 [(*Patten*)] . . . ." (*People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1077 (*Ybarra*); Accord, *People v. Lord* (1994) 30 Cal.App.4th 1718, 1721-1722.)  In *People v. Myles* (2012) 53 Cal.4th 1181 (*Myles*), the California Supreme Court held, "We are not persuaded . . . that [defendant] was prejudiced by the" "[victim-witness advocate['s] presence on the witness stand while [the murder victim's wife] testified because it created a false and distorted view of [her] demeanor and tacitly vouched for the truth of her testimony. . . .  Absent improper interference by the support person, . . . no decision supports the proposition that . . . the support person's mere presence infringes his due process and confrontation rights.  "'The presence of a second person [on] the [witness] stand does not require the jury to infer that the support person believes and endorses the witness's testimony, so it does not *necessarily* bolster the witness's testimony.  [Citation.]'  [Citation.]"  Here, the record does not disclose any circumstance indicating that [the murder victim's wife's support person] improperly influenced the jury's assessment of her testimony.  [Citation.]  Nor is there any indication that the support person displayed emotion or gestures suggesting to the jury that she believed [the murder victim's wife's] account of the incident.  [Citation.]  Notably, the court informed the jurors that [the murder victim's wife] was entitled by law to be attended by a support person during her testimony, and admonished them that the

6

support person was 'not the witness.' This admonishment, coupled with the court's instruction directing the jury to base its decision in the case solely on the evidence received at trial and not to be swayed by sympathy or prejudice, further undermines any suggestion of improper interference by the support person. [Citation.] Defendant fails to show that he was prejudiced by the presence of a support person during [the murder victim's wife's] testimony." (*Id.* at pp. 1214-1215.) The jury here received the same instruction. While we recognize that the argument in *Myles* was not an attack on the constitutionality of section 868.5, in the abstract, such as here, the Supreme Court's statements persuade us that such an attack is meritless.

Finally, to the extent that defendant's arguments are based on that aspect of section 868.5 that does not require a showing of necessity, defendant ignores the fact that here, the trial court found such necessity.

2. *Insufficient Evidence of Intent for Torture*

As they were instructed, the jurors had to find, beyond a reasonable doubt, that when defendant inflicted great bodily injury on the victim, he "intended to cause cruel or extreme pain and suffering for the purpose of revenge . . . ." Defendant here contends that there was insufficient evidence to support this finding. We disagree.

The victim testified that early the morning of the crimes at issue, defendant called her son several times, wanting to talk to the victim, but the son told him that she did not want to speak to him and the son hung up on defendant. Finally, the victim got on the phone and defendant accused her of being out earlier that morning and leaving their children alone, as though he was jealous rather than concerned. He asked her who she

7

had been with and where she had been. The victim told defendant to stop calling and she

hung up on him. Defendant called her about 10 times that morning. Later, when the

victim returned home from dropping her children off at school, she put her key in the

front door of her apartment and heard footsteps behind her. It was defendant and he

screamed, "'I want to fucking talk to you'" and he grabbed her cell phone, which she had

been using while approaching her door. The victim thought defendant was going to kill

her. Poignantly, she testified, "It was like I knew he was there to beat me up." She tried

to run past him, but he grabbed her and held her by her arms. He shoved her really hard

towards the back wall and he violently hit her on the back of her head so hard that the

blow pushed her inside the apartment. She ended up on the floor of the living room,

which was the room just inside the front door, with defendant on top of her. She tried to

stop him from hitting and kicking her and they struggled over her cell phone.[4] The attack

---

[4] The victim testified as follows,
"Q     [THE PROSECUTOR]:  And what happene[d] when you're on the floor in the living room?
        "[THE VICTIM]:  There was hitting, kicking and struggling.
"Q     [THE PROSECUTOR]: When you say there was hitting, kicking and struggling, was it one-sided, or you're both at this point struggling with each other?
        "[THE VICTIM]:  It's just . . . for *him to stop hitting me,* and it was to try to get the phone back from him."
"Q     [DEFENSE COUNSEL]:  . . . [W]hile you and [defendant] continued . . . struggling, did you *at any time attempt to hit him*?
        "[THE VICTIM]:  *No*.
"Q     [DEFENSE COUNSEL]:  Did you *ever, at any time, attempt to kick him*?
        "[THE VICTIM]:  *No*.
"Q     [DEFENSE COUNSEL]: Did you *at any time* during the struggle between you and [defendant] . . . *hit him* in self-defense?
*[footnote continued on next page]*

8

moved to outside the master bedroom. She was momentarily able to get her cell phone away from defendant on the way to the master bedroom, outside the bathroom. She denied attempting to hit or kick or actually hitting defendant during their struggle and she denied punching, kicking or slapping defendant in an effort to get her cell phone back, but admitted that she probably touched his hands while doing the latter. He was able to get it back from her. She then "woke up" on the bed in the master bedroom, with him on top of her, hitting her in the face with both fists really hard (harder than he had ever hit her before) "non-stop." He punched her 15-20 times. He wadded up her shirt and shoved it into her mouth and held the part of it that was not in her mouth against her mouth and nose, while holding her neck with his other hand. While he did this, he said, "'Shut the fuck up or I'm going to kill you.'" She was bleeding. She could not breathe and she thought she was going to die. The next thing she recalled was turning over on the bed, trying to gasp for air and throwing up blood, while defendant paced back and forth at the foot of the bed, saying, twice, "'Look what the fuck you made me do to you.'" Then he

---

*[footnote continued from previous page]*
         "[THE VICTIM]: *No.* I was trying to protect myself. [¶] . . . [¶]    "Q
[DEFENSE COUNSEL]: . . . [W]hen you were getting the cell phone back from [defendant], you *didn't punch him*?
         "[THE VICTIM]: *No.*"
  "Q     [DEFENSE COUNSEL]: You *didn't kick* him?
         "[THE VICTIM]: *No*
  "Q     [DEFENSE COUNSEL]: Or *slap him*?
         "[THE VICTIM]: *No.*"

     Therefore, there is no support in the record for defendant's assertion that, "When she fell . . . onto the floor [of the living room, the victim and defendant] struggled over her cellphone [*sic*], *both of them hitting and kicking*."

9

asked her twice if she was going to call "the fucking police." After he left, she was unable to find either her cell phone or her home phone and she went to a neighbor's where she called 911. When contacted by the police later that night,[5] defendant said that the victim "had caused him to do this" and her unfaithfulness had caused their divorce.

An oral maxillofacial surgeon who was treating the victim testified that she had breaks on the bottom and side of her right eye socket as a result of her encounter with defendant. Her maxilla, the upper jaw, was also broken on the right side. The doctor operated on the victim in April 2010.

The emergency room doctor who treated the victim just after the crimes testified that she also had blood in her sinuses, and sinusitis, an inflammation of the sinuses. She also had a whip-lash type injury to her neck.

The victim testified that after the crimes, she felt like a ton of bricks had fallen on her face. She was still undergoing treatment for her injuries at the time of trial, fourteen months after the crimes. Before her surgery, she had a sharp, burning pain in her right cheek, severe constant headaches, numbness on the right side of her face, and she was unable to chew a lot. Defendant here concedes that the victim suffered great bodily injury.

Defendant asserts that the length of time over which the offense occurs and the severity of the wounds inflicted are relevant, but not determinative, to a finding that he intended to inflict prolonged pain. (*People v. Massie* (2006) 142 Cal.App.4th 365, 371.)

---

[5] Defendant knew this officer from the former's work as a code enforcement officer under the city fire department.

He concedes that where a defendant focuses his attack on a particularly vulnerable area, such as the face, rather than indiscriminately hitting the victim, the jury may infer the intent to cause extreme pain or suffering. (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1426-1427; *People v. Burton* (2006) 143 Cal.App.4th 447, 452 (*Burton*).) Relying on *People v. Mincey* (1992) 2 Cal.4th 408, 432, 433 (*Mincey*), defendant asserts that the determination whether defendant had the requisite intent "requires the jury to distinguish between acts committed as part of an indiscriminate 'explosion of violence' and acts committed with the specific purpose of causing the victim to suffer cruel or extreme pain and suffering for" revenge. While we do not disagree with the legal proposition defendant cites, *Mincey* is not the authority for it.

Rather, *Mincey* addressed the defendant's assertion that, as a matter of law, intent to torture cannot be inferred solely from the condition of the victim's body, thusly, "As defendant points out, the severity of a victim's wounds is not necessarily determinative of intent to torture. Severe wounds may be inflicted as a result of an explosion of violence [citation] or an 'act of animal fury' [citation]. [¶] It does not follow, however, that because the severity of the victim's wounds is not necessarily determinative of the defendant's intent to torture, the nature of the victim's wounds cannot as a matter of law be probative of intent. . . . The condition of the victim's body may establish circumstantial evidence of the requisite intent." (*Mincey*, *supra*, 2 Cal.4th at pp. 432-433.)

As already stated, we do not disagree with defendant's assertion that a jury making a determination whether a defendant had the requisite intent to cause the victim to suffer

11

cruel or extreme pain and suffering must distinguish this from an *indiscriminate* "explosion of violence." However, this attack was neither indiscriminate nor an "explosion of violence" as those phrases are understood in the cases defendant, *himself*, brings to our attention, as discussed below. Defendant hit the victim 15-20 times in the face. As defendant himself notes, *Burton*[6] held this is a particularly vulnerable area and an attack on it does not constitute an indiscriminate one.

In *People v. Sears* (1965) 62 Cal.2d 737 (*Sears*) [overruled on other grounds in *People v Cahill* (1993) 5 Cal.4th 478, 510, fn. 17], a case defendant cites, the defendant was attacking his estranged wife with a steel pipe he had brought with him when her daughter came upon them and yelled at the defendant to stop. (*Id*. at p. 741.) The defendant then turned on the child, hitting her with the pipe and fatally stabbing her with a knife. (*Ibid*.) The California Supreme Court noted that mayhem constituted the deprivation, disability, disfigurement or the rendering useless of a member of a person's body, or the cutting or disabling of a tongue or putting out an eye or slitting the nose, ear or lip. (*Id*. at p. 744.) The defendant had hit the murder victim about the head and face with a metal pipe. (*Id*. at p. 741.) The court concluded that there was insufficient evidence that defendant intended to commit mayhem, where he had hit the murder victim several times with a steel pipe—one blow lacerated her lip and another, her nose. (*Id*. at p. 745.) The court concluded, "such evidence does no more than indicate an

---

[6] Actually, defendant cited *Hamlin*, but *Hamlin* cites *Burton* for this proposition and *Hamlin* did not involve injuries to the face. (*Hamlin*, *supra*, 170 Cal.App.4th at pp. 1429-1430.)

12

indiscriminate attack; it does not support the premise that defendant *specifically intended to maim his victim*." (*Ibid*.) Unlike in *Sears*, the victim here did not suddenly come upon defendant—he went to her apartment to confront her. Moreover, this was not an indiscriminate attack.

The holding of *Sears* also applied in *People v. Anderson* (1965) 63 Cal.2d 351, which defendant also cites. In *Anderson*, the defendant inflicted over 60 stab wounds and superficial cuts from the minor victim's head to her extremities. (*Id.* at p. 356.) "The prosecution contended that defendant, after being sexually aroused by alcohol, attempted to [once] . . . again . . . molest [the child victim], that she refused and either threatened to implicate defendant or to scream, and that defendant killed her to silence her." (*Id.* at p. 357.) The facts in *Anderson* were unlike the facts here, where defendant's attack was directed at a particularly vulnerable part of the victim's body and did not constitute an indiscriminate attack. (*Id.* at p. 356.) Of more applicability is *Anderson*'s holding about the sufficiency of the evidence in that case that the defendant committed felony torture murder, that "In order to support murder by torture, the evidence must demonstrate that 'the assailant's intent was to cause [the victim] cruel suffering . . . .' [Citation.] Thus, in . . . [*People v.*] *Tubby* [(1949) 34 Cal.2d 72, 77 (*Tubby*)] the viciousness of the attack alone could not justify a murder by torture. The [*Tubby*] court stated, 'It is too apparent to admit of serious doubt that the unprovoked assault was an act of animal fury produced when inhibitions were removed by alcohol. The record dispels any hypothesis that *the primary purpose of the attack was to cause the deceased to suffer*.' [Citations.] [¶] Those cases in which this court has upheld convictions of murder by torture have all

13

involved some evidence tending to prove the requisite intent. . . .  In *People v. Daugherty* (1953) 40 Cal.2d 876, 886, . . . in which a husband was convicted of murder by torture of his wife, *the couple's relationship involved prior threats, marital strife, and the husband's anger over divorce proceedings.*  The husband made statements prior to the killing that indicated ' . . . a wish . . . to cause her to suffer.'  [Citation.]  Furthermore, when the victim 'was lying on the ground but still alive, he stood over her and *kicked her.*'  [Citation.]  . . .  [¶]  In contrast, the evidence in the instant case shows only an explosion of violence without the necessary intent that the victim should suffer."  (*Id.* at pp. 359-360.)  Like *Daugherty*, there was evidence here that defendant had previously threatened the victim, that they experienced marital strife and that he was angry over what had taken place in their relationship.  Unlike *Anderson*, the attack here was not unprovoked in defendant's mind,[7] alcohol was not involved and this was the last in a long line of physical assaults on the victim by defendant, not exactly an unprecedented explosion.

*People v. Lee* (1990) 220 Cal. App.3d 320 (*Lee*), which defendant cites, also does not support his position.  In *Lee*, the defendant had been charged with aggravated mayhem, which was "under circumstances manifesting extreme indifference to the physical or psychological well-being of another person, intentionally caus[ing] permanent disability or disfigurement . . . or deprives a [person] of a limb, organ or member of his or her body."  (*Id.* at p. 324.)  The appellate court noted that "aggravated mayhem is a

---

**7**  As stated before, both at the time of the attack and later that night defendant claimed that the victim had "made him do it."

specific intent offense, the specific intent to cause the maiming injury [is] an element of the crime. (*Id.* at pp. 324-325.) The appellate court likened the intent for aggravated mayhem to the intent necessary for mayhem felony murder, as discussed in, inter alia, *Sears* and *Anderson*. (*Id*. at p. 325.) The court remarked, "Those cases indicate that evidence which shows no more than an 'indiscriminate attack' on the body of the victim is insufficient to prove the specific intent to commit [simple mayhem] . . . . In addition, that specific intent cannot be inferred solely from evidence that the injury inflicted constitutes mayhem; instead, there must be other facts and circumstances which give rise to an inference of intent to maim rather than attack indiscriminately. [Citation.] [¶] . . . [¶] In contrast, in [*People v.*] *Campbell* [(1987) 193 Cal.App.3d 1653], another felony-murder mayhem case, a *jealous lover* inflicted about 25 non-life-threatening punctures to the *left side of his girlfriend's face with a screwdriver*. He also *battered the right side of her head and face with a cinder block brick*, extensively tearing her right ear. The court concluded this evidence was sufficient to establish sufficient intent to maim. 'The facts indicate [the defendant] limited the amount of force he used with the screwdriver rather than stabbing with his full force, and limited the scope of the attack with the brick to the head and face, rather than randomly attacking [the victim's] body. *The controlled and directed nature of the attack supports an inference* [*the defendant*] *intended to disfigure* [*the victim's*] *face, including her right ear.*' [Citation.]" (*Id*. at pp. 325-326, italics added.) In *Lee*, the victim, who had never before had problems with the defendant, his neighbor, was suddenly attacked in his apartment by the defendant without provocation or any other reason. (*Id*. at p. 323.) The defendant hit the victim once each in the nose,

eye and mouth.  (*Ibid*.)  He also kicked the victim at least twice, somewhere on the victim's body, but not his head.  (*Id*. at p. 326.)  The victim was paralyzed as a result of acute head trauma.  (*Id*. at p. 323.)  The appellate court concluded that there was insufficient evidence that the defendant had the specific intent to cause the maiming injury, saying, "[The d]efendant punched his victim in the face three times. [The d]efendant also kicked his victim at least twice [somewhere other than in the head]. The evidence shows no more than a sudden, indiscriminate, and unfocused battering of [the victim's] body.  . . .  [I]t does not show a controlled, directed, limited attack . . . from which a jury could reasonably have inferred that [the d]efendant specifically intended to disable [the victim] permanently."  (*Id*. at p. 326.)  Here, unlike in *Lee*, there was a controlled and limited attack, directed by defendant at the victim's face.

The other cases defendant cites, *People v. Ferrell* (1990) 218 Cal.App.3d 828, *People v. Park* (2003) 112 Cal.App.4th 61 (*Park*) and *People v. Quintero* (2006) 135 Cal.App.4th 1152, repeat the above cited themes, i.e., that the intent to maim is supported by evidence that the defendant shot the victim in the neck at close range, paralyzing her, while not shooting her anywhere else, or threw a 19-inch long steel knife sharpener from behind his head at the victim's head, then tried to hit the victim with the sharpener, finally succeeding in breaking eight of the latter's teeth, or cut the victim's face with a knife and stabbed him in the chest and neck.

Language in *Park* is particularly instructive here, "[The d]efendant's mode of attack demonstrates this was *not an indiscriminate attack*.  He attacked using the steel knife sharpener in a throwing motion by bringing the weapon from behind his head and

over his shoulder. This action gave his blows *more force and therefore gave him a greater ability to inflict serious bodily injury* than if he had simply held the sharpener in front of him and tried to jab or stab [the victim]. Significantly, [the d]efendant *aimed at an extremely vulnerable portion of* [*the victim's*] *body: his head*. When [the victim] tried to defend himself by holding his arm in front of his face, [the d]efendant *did not strike other portions of* [*the victim's*] *body* but instead first hit [the victim's] arm several times to break through this defense and then hit [the victim] in the mouth. [The d]efendant's *limiting the scope of his attack to* [*the victim's*] *head shows this was not an indiscriminate attack but instead was an attack guided by the specific intent of inflicting serious injury upon* [*the victim's*] *head*. It is particularly significant that [the d]efendant stopped his attack once he had maimed [the victim's] face; he had accomplished his objective." (*Park*, *supra*, 112 Cal.App.4th at p. 69.) Here, the victim testified that defendant hit her with greater force than he had ever previously used on her. His blows were aimed at and struck her face, a particularly vulnerable spot on her body, especially in terms of pain and suffering. He hit her nowhere else. Finally, he stopped after delivering 15-20 blows to her face. Like the attack in *Park,* the attack here was not indiscriminate and there was more than sufficient evidence to conclude that it was guided by the intent to cause cruel and extreme pain and suffering.

Defendant's citation to torture cases where the facts show a prolonged attack or the continuation of an attack after the victim is crying from the initial assault (*People v. Proctor* (1992) 4 Cal.4th 499; *Mincey*, *supra*, 2 Cal.4th 408; *People v. Pensinger* (1991) 52 Cal.3d 1210; *People v. Misa* (2006) 140 Cal.App.4th 837) and the cases cited for the

17

first time in his reply brief, for which the People have no opportunity to respond, does not undermine our conclusion. The facts in these cases are simply different from the facts here.

It is not until defendant's second contention, that there was insufficient evidence that he acted for revenge, that the true essence of his assertion in regard to the present contention becomes clear, i.e., that "when [the victim] refused to give him her cellphone [*sic*], [he] suddenly engaged in an unfocused battering by shoving, hitting and kicking her, which culminated in him repeatedly punching her in the face." Thus, defendant attempts to escape the glaringly evident fact that the attack that resulted in the victim's injuries was not indiscriminate and unfocused, as discussed above. The problem with defendant's argument, however, is revealed in his own recitation of how this case was tried, as well as the evidence that was presented to the jury. Defendant, himself, admits that "the state's theory was that the assault of [the victim] *in the bedroom* [where defendant punched her 15-20 times in the face and did not shove, kick or otherwise hit her] constituted torture . . . ." Moreover, the victim never testified about the injuries defendant inflicted upon her during the shoving, hitting and kicking that preceded the face-punching in the bedroom. Additionally, the expert witnesses, i.e., the emergency room physician and the oral maxillofacial surgeon who treated the victim, testified only about the injuries that had been inflicted in the bedroom. By trying to combine the pre-bedroom acts with those that occurred in the bedroom, defendant creates a red-herring and provides the only means of escape, albeit disingenuous, from the obvious conclusion that his punching of the victim in the face was done with the requisite intent.

18

Next, defendant asserts that there was insufficient evidence that he acted for the purpose of revenge. He does this by misconstruing the facts. Defendant asserts that "in front of her apartment . . . when [the victim] refused to give him her cellphone [*sic*], he shoved and hit her in the back of the head." In fact, as stated above, the victim testified that one or two seconds after defendant yelled that he wanted to talk to her, he grabbed her cell phone, which she was holding between her ear and her shoulder as she walked to the front door. Even in his statement to the police, defendant did not assert that the victim refused to give him her cell phone. Rather, he said that he took it from her after he thought she was speaking to her boyfriend about the previous night while walking up to her front door.[8] Defendant goes on with his assertion, saying that he "continued assaulting her by hitting and kicking her in the living room while the two struggled for the cellphone [*sic*]." This is accurate. Then, defendant states, "When [the victim] denied having the affair, the assault moved into the bedroom where [defendant] repeatedly punched [the victim] in the face." However, the victim never testified that she and defendant discussed her affair any time during their interaction either in front of or inside her apartment. Defendant told the police that *at some point* inside the apartment he told the victim that she kept lying to him and he knew the man she was "cheating on" him

---

[8] Defendant is a bit more accurate in his statement of facts when he says, "As [the victim] was putting her key in the door, she . . . saw [defendant] coming towards her, screaming, "'I want to fucking talk to you.'" [Citation.] . . . She tried to run past [defendant], but he stopped and held her. [Citation.] He took her cellphone [*sic*]. [Citation.]" This was still not the correct order, but at least defendant did not assert that the victim refused to give him her cell phone.

with, she then ordered him out and he slapped her once.[9]  Not only did the victim not

testify that this verbal exchange occurred, she specifically denied that defendant had

slapped her.  Additionally, defendant, himself, contradicted this version by also telling

the police that after they struggled over the cell phone, presumably in the living room,

during which time she hit and kicked him, he slapped her, she kicked him, he "lost it," he

saw the blood on her, handed her a napkin, then she told him to get out, and he panicked

and left.

Built on these faulty premises, defendant continues, "Thus, the evidence reveals

that [defendant] had once again become [*sic*] enraged over [the victim's] affair, and when

she refused to give him her cellphone [*sic*], suddenly engaged in an unfocused battering

by shoving, hitting and kicking her, which culminated in him repeatedly punching her in

the face.  [¶]  In short, there was insufficient evidence that [defendant] specifically

intended to cause [the victim] cruel and extreme pain and suffering for the purpose of

revenge.  Instead, [defendant] was doing what he had always done; he was beating [the

victim] in an explosion of anger out of frustration over her affairs."  However, the victim

testified that defendant had accused her earlier that morning during his phone calls to her

---

[9]  Interestingly enough, during a pretrial hearing about the admissibility of prior acts of domestic violence perpetrated by defendant on the victim, defense counsel corrected the trial court when it said that defendant had made those statements while he and the victim were in the living room.  Defense counsel asserted that the victim had testified at the preliminary hearing that defendant had made those statements to the victim earlier that morning over the phone.  In fact, counsel said that at the preliminary hearing when the victim was asked what, if anything, she and defendant were talking about during the struggle inside the house, the victim responded that she did not remember.

with being out that morning and leaving the children alone.[10] Defendant told the police that at some point on the day of the crimes, the victim had told him that she was not leaving the children alone. As already stated, there was no evidence that defendant "suddenly engaged in an unfocused battery by shoving, hitting and kicking the victim . . . when she refused to give him her cellphone [*sic*]." Additionally, defendant, himself, did not testify that he exploded due to her affairs—rather he said he slapped her and "lost it" because she hit and kicked him. Finally, there is very little evidence that defendant confronted the victim about her boyfriend in front of or inside the apartment—just defendant's self contradicted statements to the police.

We agree with the People that there was more than sufficient evidence that defendant acted for revenge. Defendant, himself, told the police hours after the crimes, the victim's unfaithfulness had caused the couple to divorce and he blamed the victim for the fact that he had been fired from his job. He said that she was a bad mother to their children. He said that she had been cheating on him since February, during times when they were still together.[11] He admitted that he was very angry at her. He said it was her fault that he hurt her. He said that after 2:00 a.m. on the day of the crimes, he drove by

---

**10** Also see footnote nine, *ante*, page 20.

**11** However, the victim testified that they were not together after March 2009 and she had had a domestic violence restraining order on him since April 2009. The parties stipulated that a copy of this order had been served on defendant on May 19, 2009 and it was valid until May 18, 2014. The victim testified that she had filed for divorce in April 2009, the same month she, alone, rented the apartment in which she and her children lived. She said that defendant never stayed in that apartment, he did not have the key to it, she had not told her children that they could give him the key to it, she did not tell defendant he could come and go from it and defendant had no possessions there.

21

the victim's apartment and noticed that her car was not in its parking spot. He returned at 4:00 a.m. and things had not changed. He assumed that she was out with her boyfriend. He returned a third time at 6:00 a.m. and things were status quo, so he called their older son, but got no answer. He said he was very upset during these episodes of checking on her. After he spoke to her on the phone that morning, he decided to "let her be," but he continued to be bothered about the situation. He went to the bakery, where he worked, but when he saw the victim drive by the establishment, he followed her to her apartment, where the confrontation occurred. He admitted that after the incident, he used her cell phone to send her co-workers, whom he assumed supported her in having a boyfriend, photos and a video of a penis. Defendant said he thought the picture/video was of the victim's boyfriend's penis. All of this established that he beat her in the face for revenge.

In his reply brief, for the first time, defendant launches into an extensive argument about the intent of the voters in passing Proposition 115, which established the crime of torture, defines it and provides for its punishment. However, defendant may not assert in his reply brief, when there is no opportunity for the People to respond, an argument not advanced in the opening brief. (*American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App. 4th 1446, 1453.) Moreover, defendant's contention is meritless. Defendant asserts that because the proposition was created in response to the actual brief sentence served by the defendant in *People v. Singleton* (1980) 112 Cal.App.3d 418, in which the defendant chopped off the arms of the victim, after raping her and before leaving her for dead in a ditch, the crime of torture must be reserved for crimes that are tantamount to that. However, all the cases we have discussed thus far arguably are not in the same category

22

as the horrendous facts in *Singleton*, yet both appellate courts and the California Supreme Court have upheld convictions of torture in them. If the voters of California wished to limit torture to the cutting off of the victim's arms and similar acts, they were free to do so, but did not. Torture has been an element of first degree murder since 1872. (§ 189.) The definition of torture given this jury has been utilized by the courts since *1945* (*People v. Heslen* (1945) 162 P.2d 21; *Tubby*, *supra*, 34 Cal.2d 72, 76, 77) and we have already concluded that there was sufficient evidence to support the verdict.

3. *Admission of and Jury Instruction on Evidence of Other Acts of Domestic Violence*

Prior to trial, the People filed a written motion seeking permission to introduce evidence of a number of incidents of domestic violence between defendant and the victim. The People asserted that this evidence was admissible under Evidence Code section 1109. That section provides, in pertinent part, "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." The People also asserted that this evidence was highly probative and not unfairly prejudicial. In his motion in limine, defendant asserted below that the evidence was irrelevant, highly prejudicial and introduction of it would unduly consume time and confuse or mislead the jury. The trial court ruled that evidence of some of those incidents could be introduced. Defense counsel then abandoned her objection to the evidence being used in relation to the charged corporal injury to a spouse and objected to it being introduced in relation to the charged torture. Counsel asserted that the evidence was prejudicial, misleading and

23

confusing. She also asserted that allowing the evidence to be used to prove anything related to the torture charge would violate defendant's due process rights. In this regard, counsel asserted that evidence admitted under section 1109 could only be used for general intent crimes. The following day, the trial court concluded that section 1109 evidence is not so limited, citing *People v. Ogle* (2010) 185 Cal.App.4th 1138. Defense counsel confessed that she could find no authority for her position that section 1109 evidence could only be introduced as to general intent crimes, however, she asserted that under section 352, it should be excluded. The trial court said that it had already exercised its discretion under section 352 as to evidence of the prior acts it had previously ruled was admissible.

In accordance with the trial court's ruling, the victim testified that in 1998, while she and defendant were separated, but continued to see each other, on approximately eight occasions, when the victim was asleep, defendant came over to her home at about 2:00 or 3:00 a.m. and picked up the mattress on which she was sleeping, causing her to roll off, while screaming at her that she was a whore. After 1998, while she and defendant were divorced, but he continued to live with her and the children in Cathedral City, defendant verbally and physically abused her, including arguments about her affair in 1995 and him shoving, kicking, pushing and slapping her, resulting in bruises all over her body. Defendant told her not to tell anyone and she was afraid of him. Between April and October 2007, there were many incidents during which defendant pointed a gun at the victim and said he was going to kill her. She believed him. In November 2007, defendant threw and flipped furniture out of anger over her 1995 affair. Also, in

24

November 2007, the victim accompanied defendant on a trip to Las Vegas. On the way home, by the back roads, defendant beat the victim because he believed a man had made a comment directed at her. He slugged and punched her, causing her head to hit the window and dislocating her jaw. He tried to rip off her breasts, saying he paid for them. He assaulted her vagina with his fingers. While they were in the desert, he made her get out of the car, without her cell phone or purse, and drove off. Her clothes were ripped off and she was bleeding. He later returned and yelled, "Get back in the fucking car." She felt she had no choice but to get back in the car. Defendant resumed hitting her and pulling her hair. His mother was at home, watching the couple's children, and when they arrived home, he had the victim enter the home through the garage while he took his mother out of the house through the front door. He had the victim stay in a room in the house so his mother would not see her. In January 2008, the victim was in the house showering while defendant was supposed to be at work. Defendant came home, opened the shower door and screamed at the victim. She tried to close the shower door, but he stopped her. He pulled her out of the shower onto the floor where he kicked her with steel-toe boots. When she tried to get up, he punched her down. In late 2008 or early 2009, defendant yelled at her as she lay in bed at night in the dark. She heard him get and load a gun and he said, "'Don't . . . fucking think I'm not going to kill you.'" He pointed the gun at her and said he was going to kill her. The victim told him to go ahead and do it. He fired in the dark and the bullet missed her by five inches. She got in her car and drove to a friend's house, but did not go inside as she did not want to disturb her friend. Defendant called her and asked her if she was going to call the police. She said she

25

already had.  He said he was on the way to Mexico.  In April 2009 she applied for a domestic violence restraining order concerning this incident.  She did not mention in her application any other incidents involving guns because there were so many.  Finally, in June 2009, defendant violated the restraining order already mentioned by approaching the victim when she was parked outside her apartment.  As already mentioned, it was stipulated that defendant had been served with a copy of this restraining order on May 19, 2009 and it was effective until May 18, 2014.

At the conclusion of trial, the court instructed the jury as to all these incidents, except the November 2007 furniture throwing and flipping one, that, "The People presented evidence that the defendant committed domestic violence that was not charged in this case . . . .  [¶]  [Domestic violence was then defined]  [¶]  . . .  [¶]  You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged domestic violence.  [¶]  [Proof by a preponderance was then defined.]  [¶]  If the People have not met this burden of proof, you must disregard this evidence entirely.  [¶]  If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence, and based on that decision, also conclude that the defendant was likely to commit and did commit the crimes charged here in this case.  [¶]  If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence.  It is not sufficient by itself to prove that defendant is guilty of [t]orture, or [d]omestic [v]iolence, or [f]irst [d]egree [b]urglary, or

[f]alse [i]mprisonment, or a [v]iolation of a [r]estraining [o]rder. [¶] The People must still prove each charge and allegation beyond a reasonable doubt."

Defendant contends that section 1109 violates due process. Defendant concedes that the California Supreme Court in *People v. Falsetta* (1999) 21 Cal.4th 903 rejected such an argument in relation to section 1109's sister provision, section 1108, which governs sexual offenses. He also concedes that numerous courts of appeal in this state have applied *Falsetta*'s reasoning to section 1109. Although he does not mention it, this court did precisely that 13 years ago in *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1027-29 [Fourth Dist., Div. Two]. However, defendant asserts that the analysis in *Falsetta* is flawed. We are bound by *Falsetta* (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455) and we see no reason to depart from the position we took long ago in *Hoover*.

Next, defendant assails the jury instruction on this evidence. First, he claims that the instruction allowed the jury to convict him on proof less than beyond a reasonable doubt. This argument has been rejected by the California Supreme Court as to section 1108's version of a similar jury instruction in *People v. Reilford* (2003) 29 Cal.4th 1007, 1013-1016.) The fact that appellate courts are bound by the holding in *Reilford* served as the basis for the court's rejection in *People v. Johnson* (2008) 164 Cal.App.4th 731, 738, 739, 740, that the same instruction given here violated due process, was internally inconsistent and was inconsistent with other instructions given and, as a result, confused or misled the jury about the burden of proof and what proof is necessary for conviction.

27

(Accord, *People v. Reyes* (2008) 160 Cal.App.4th 246, 252, 253; *People v. Pescador* (2004) 119 Cal.App.4th 252, 261-262.)

Defendant's reliance on *People v. Vichroy* (1999) 76 Cal.App.4th 92 is misplaced. The instruction given there required proof of the priors beyond a reasonable doubt, but did not contain the last paragraph of the instruction given here, to wit, "If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence.  It is not sufficient in itself to prove that the defendant is guilty of [the charged crimes].  The People must still prove each charge and allegation beyond a reasonable doubt."  *Vichroy* condemned the use of prior acts "as proxy or substitute for proof for . . . [the defendant's] guilt of the currently charged offenses.  The constitutional infirmity arises in this case because the jurors were instructed that they could convict [the defendant] of the current charges based *solely* upon their determination that he had committed prior sexual offenses.  [The instruction] . . . required no proof at all of the current charges."  (*Vichroy*, at p. 99, italics added.)[12]  The presence in the instruction given this jury, as reiterated above, provided just the opposite of the instruction condemned in *Vichroy*.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

---

[12]  *People v. Orellano* (2000) 79 Cal.App.4th 179, 184, which defendant also cites, involved an instruction identical to that in *Vichroy,* and, of course, different from the instruction given here.  By parity of our reasoning as to *Vichroy*, *Orellano* is equally inapplicable.

28

RAMIREZ             
P. J.

We concur:

McKINSTER           
               J.

KING                
               J.